BRUCE LINCOLN–MERCURY, INC., a Pennsylvania corporation

v.

UNIVERSAL C.I.T. CREDIT CORPORATION, Appellant.

No. 14039.

United States Court of Appeals.
Third Circuit.

Argued March 8, 1963.

Decided Oct. 31, 1963.

As Amended Nov. 18, 1963.

Rehearing Denied Dec. 30, 1963.

**4**

Bernard G. Segal and Samuel D. Slade, Philadelphia, Pa., Robert A. Doyle, Pittsburgh, Pa. (Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., on the brief), for appellant.

T. Robert Brennan, Pittsburgh, Pa. (Brennan & Brennan, Pittsburgh, Pa., on the brief), for appellee.

Before BIGGS, Chief Judge, and KALODNER and FORMAN, Circuit Judges.

FORMAN, Circuit Judge.

Bruce Lincoln-Mercury, Inc. (referred to hereinafter as Bruce Lincoln or appellee), a Pennsylvania corporation, having its principal place of business in Altoona, Pennsylvania, filed a complaint May 28, 1959, in the United States District Court for the Western District of Pennsylvania against Universal C.I.T. Credit Corporation (referred to hereinafter as U.C.I.T. or appellant). It alleged, among other things: "By reason of the wilful and malicious acts of the defendant, plaintiff has been forced out of business, has incurred operating losses [and] has failed to receive accounting from the defendant of moneys due and owed. * * *" U.C.I.T. filed an answer on December 31, 1959, wherein, among other things, it not only denied the commission of acts causing Bruce Lincoln to go out of business, but declared that it went out of business as the result of its own mismanagement. The trial came on before the court and a jury, which awarded $50,000 compensatory and $5,000 punitive damages to Bruce Lincoln.

U.C.I.T. has appealed. Appellant contends that the Trial Court erred in refusing to grant either its motions for directed verdict or for judgment after the verdict.[1] The Court should have granted these motions by virtue of Bruce Lincoln's failure, appellant urges, to show that U.C.I.T.'s acts were tortious and that there was a basis in the record to support the damages awarded by the jury. At a minimum appellant requests that a new trial should be ordered on the ground that the trial judge acted under a mistake of law and the verdict is against the clear weight of the evidence.

█ The material facts of the instant case are in dispute. Since the verdict of the jury favored Bruce Lincoln, the testimony must be construed in the light most favorable to the appellee.

[1]. See Bruce Lincoln-Mercury, Inc. v. Universal, C. I. T. Credit Corp., 203 F.Supp. 177 (W.D. Pa.1962).

At the trial it was disclosed that on or about March 17, 1956, Bruce M. Lingenfelter purchased the assets of the Lincoln-Mercury automobile agency in Altoona, Pennsylvania from John Stallard for $15,000. Included in this purchase were parts, equipment, used and new cars. Ford Motor Company approved the sale and issued a franchise to Mr. Lingenfelter to sell Lincoln and Mercury automobiles.

Mr. Lingenfelter was without the capital to pay cash to the manufacturer in order to purchase new cars. Hence, he applied to the appellant for the customary financing. As a result, on March 17, 1956, Mr. Lingenfelter and U.C.I.T. entered into an "Agreement for Wholesale Financing". Among other things, the conditions of this contract called for appellant to pay to the Lincoln-Mercury division of Ford Motor Company invoice prices for newly manufactured automobiles ordered by Mr. Lingenfelter from Ford and delivered by it to his showroom floor. Such an arrangement was commonly known as "Floor Plan Accommodation". In exchange Mr. Lingenfelter agreed to pay to appellant immediately upon the sale of the new automobiles the sum advanced by appellant to Ford, plus certain interest and carrying charges. In addition, the parties entered into a plan whereby appellant would finance the purchase or lease of new and used cars by retail customers.

On March 20, 1956, a corporation was formed under the name of Bruce Lincoln-Mercury, Inc. The incorporators and stockholders were: Mr. Lingenfelter, an experienced dealer in used cars; Louis Kline, a meat packer; and Harry Benton, a local attorney. The outstanding stock of the company consisted of 30 shares. A certificate for ten shares was issued to each of the three incorporators. Mr. Lingenfelter became president of the corporation, Mr. Kline, vice president, and Mr. Benton, secretary-treasurer.

Mr. Lingenfelter and appellant entered into their contractual relationship on March 17, 1956, although the corporation was not chartered until three days later—March 20, 1956. Appellant, however, was aware that the corporation was in substance the real purchaser of the Lincoln Mercury franchise.

On April 2, 1956, appellee borrowed $10,000 from appellant as a capital loan, for which appellee gave a demand judgment note in that amount endorsed by Messrs. Lingenfelter, Kline and Benton. In the absence of a demand the note called for a payment of $280.00 per month for eleven consecutive months followed by one payment of $6,920 with interest at 5½ percent per annum. Additionally, Messrs. Lingenfelter, Kline and Benton, pledged their 30 shares of stock in the appellee to appellant as security for the capital loan; and Mr. Lingenfelter assigned a life insurance policy to appellant as further security.

Mr. Lingenfelter and David C. Miller, then district manager of appellant at Altoona, negotiated the financing of the appellee. Mr. Miller recommended the account on the basis of a "pro forma" financial statement designed to reflect a picture of the business on its starting day, and the representations that Messrs. Lingenfelter and Benton were substantial citizens. The financial statement was signed and delivered on March 14, 1956 by Mr. Lingenfelter in the name of "Bruce Lincoln-Mercury", evidently anticipating the formation of the corporation.

After being assured of the requisite financing from appellant, appellee began to operate its automobile agency, selling new Mercurys and Lincolns and used cars. According to Mr. Lingenfelter, business relations with appellant proceeded smoothly until August of 1956 when Adrian W. Mather replaced Mr. David C. Miller as district manager. Testimony revealed that Mr. Mather developed an immediate hostility to Mr. Lingenfelter and their relationship rapidly developed from bad to worse.

Appellee charges that appellant committed two separate acts which constituted the tortious conduct for which it seeks damages. The first act, it is alleged, occurred on the night of Septem-

ber 19, 1956, when appellant's agents demanded the balance due on the $10,000 judgment note under threat of execution on the following morning if it were not paid that night. The other act, is alleged to have occurred on the evening of November 14, 1956. Appellee asserts that appellant's district manager Mather and other of its employees entered the showroom of appellee that evening without prior notice or demand, ordered prospective customers away from the five 1957 Mercury cars being shown therein and then "auctioned off the five cars to the used car dealers. * * *"

### The Incident of September 19, 1956

On September 19, 1956, about 11:00 p. m., Mr. Lingenfelter received a telephone call from Mr. Mather, who ordered him to go to Stover's Restaurant immediately. Mr. Mather also called Mr. Benton. He commanded him to communicate with Mr. Kline and go with him to the restaurant forthwith.[2] All three arrived at Stover's Restaurant between 11 o'clock and midnight. After looking inside, they saw no one familiar to them. A short time later Mr. Mather, and Fred Bennett, the director of sales for the Pittsburgh Division of the appellant, emerged from a nearby beer garden.

According to testimony given by Mr. Lingenfelter and Mr. Benton, both Messrs. Mather and Bennett thereupon insisted, in a bullying, loud, and drunken manner, which was to continue throughout this meeting, that everyone go inside Stover's. All five sat at a table in the restaurant which Mr. Lingenfelter claimed at trial "was crowded at that

time of night" and contained "familiar faces".

Messrs. Mather and Bennett declared that they were calling the capital loan and threatened to close appellee's business. Mr. Lingenfelter asked them, he testified, to discuss the matter in his office so that they could preclude the people present from hearing this embarrassing conversation. The appellant's representatives, however, declined the request. Finally, Mr. Lingenfelter said that he would pay off the loan the next morning. According to Mr. Benton the meeting at Stover's lasted "five to ten minutes".

Besides its belief that appellee's financial structure was deteriorating, appellant suggested the following two reasons for the calling of the note on September 19: (1) that appellant believed appellee had issued a check which was not covered with sufficient funds, and (2) that appellant believed appellee had breached the Agreement for Wholesale Financing, which provided that appellee would pay appellant for each car financed by U.C.I.T. forthwith after it had been sold.

On or about September 14, appellee's bookkeeper, Frank Oessinich, informed John Mitchell, an employee of the Altoona office and Howard Allison, an adjustor of appellant, that a check for $7,898.16 made by appellee on September 13, was not covered by sufficient funds at time of issuance. Mr. Mather immediately reported this to the Pittsburgh office. Mr. Bennett then proceeded to Altoona to collect on the check and call the capital loan. The check, unbeknown to Mr. Bennett, had cleared prior to Mr. Bennett's departure for Altoona. Appellant submitted that it was not a ques-

---

**2.** Mr. Benton testified:

"Mr. Mather identified himself and told me—he gave me an ultimatum as to how long I had to get to Stover's Restaurant. And I asked him what it was about and he said it was an important decision they had made in respect to Bruce-Lincoln Mercury and I was obligated and I had to appear there. And he then asked me how to get in touch with Mr. Kline. At that time, Mr. Kline was living in a motel. He

didn't have a phone. So, I told him I would attempt to get Mr. Kline there because he was—said it was also important that Mr. Kline be there. He was very insistent, as a matter of fact. I then changed into other clothes. I went to the motel. I ascertained Mr. Kline's room, went down and I got Mr. Kline out of bed and we then proceeded to the Stover's Restaurant."

tion of the check's clearance but whether sufficient funds were in the bank at time of its issuance.

It was adduced at the trial that the bank balances of appellee at the end of each day, for the period surrounding the check were: September 11—$9,597.08; 12th—$12,529.49; 13th—$8,476.00; and the 14th—$7,916.46. Appellant's witness, Mr. Oessinich, conceded that according to the statement rendered by the bank there was a sufficient balance on September 10, 11, 12, 13, and 14 to cover the check of $7,898.16. However, he claimed that appellee's books and records under his charge disclosed that there was insufficient money to clear the check on the date it was issued.

Both Messrs. Allison and Mitchell testified that when they visited appellee prior to September 19, 1956, for the purpose of making physical checks of the inventory on the floor, there were several occasions when the full inventory of cars which should have been located at the dealership were not there.

Henry G. Ahlquist, Jr., a certified public accountant, employed by appellant in the preparation for trial, conducted an audit of appellee's books. He certified the audit on a qualified basis, i. e., only to the extent of the records made available to him. A statement formulated by the accountant revealed the following lapses of time between the due date and date of payment for certain cars:

| Serial Number | Date Due | Date Paid | Lapsed Days | Amount Delinquent |
|---|---|---|---|---|
| 56ME84597M | 8–21–56 | 8–29–56 | 8 | $2,081.71 |
| 56ME86214M | 8–21–56 | 8–29–56 | 8 | $2,404.31 |
| 56ME86242M | 8–20–56 | 8–29–56 | 9 | $2,112.96 |
| 56WA45717L | 8–22–56 | 8–29–56 | 7 | $3,969.95 |

Mr. Lingenfelter expressed the view that a new car dealer "can't run up" and make a payment to his financing company every time he sells a car. He stated: "I would wait two and three cars. Pay them off at once."

Messrs. Bennett and Mather denied any unseemly conduct in their demand upon the stockholders of appellee that the capital note be liquidated. They testified that they only carried out the directive of their superiors to effect the collection. After appellant's representatives delivered their ultimatum on the night of September 19, 1956, appellee's stockholders immediately conferred how the demand should be met. As a consequence, Mr. Kline advanced to the corporation his checks for $8,600 to liquidate the balance due on the capital note.

On September 20, 1956, at about 9:00 a. m., Mr. Lingenfelter delivered the checks at the Altoona office of the appellant. At the same time he notified appellant of appellee's decision to termi-

nate their business relationship and that thenceforth appellee would obtain financing from Commercial Credit Corporation.

*The Car Selling Incident of Mid-November 1956*

Following is an endeavor to distill from the hodgepodge of often conflicting and obviously mistaken testimony some semblance of order of the circumstance and events upon which this segment of the litigation is based.

Even before September 19, 1956, Mr. Lingenfelter had explored with Commercial Credit the possibility of its replacing appellant as its financing agency. Through its branch manager in Altoona, Charles McLaughlin, Commercial Credit agreed to finance appellee's wholesale purchase of new cars and retail sales of existing inventory. On or about October 3, 1956, the Altoona office notified appellee by letter that Commercial Credit accepted appellee's "Dealer Wholesale

Underlying Agreement" and related contracts. Accordingly Commercial Credit delivered its checks for $65,665.92 and $2,757.57 to appellant in full liquidation of appellee's financing transactions. But subsequently the divisional credit department of Commercial Credit in Pittsburgh refused financing on appellee's wholesale purchase of new cars.

On November 15, 1956, the Pittsburgh office of Commercial Credit notified the Altoona office by letter that it had declined the wholesale account of appellee. Carl S. Kreiling, the assistant divisional manager of Commercial Credit at Pittsburgh, testified that he assumed the credit manager of the Pittsburgh office orally notified the Altoona office of the declination before November 15.[3] The reason for the refusal was that appellee was insufficiently financed "for us to carry it for the extension of this much credit." Nevertheless, it did continue financing appellee's retail transactions.[4]

The branch manager of Commercial Credit in Altoona stated that he "must have" notified appellee his company would not finance the new 1957 automobiles. But appellee maintained that it did not receive such notification.

Ford had extensively advertised the first showing of its 1957 Mercury, which Mr. Lingenfelter testified was to be on November 14, 1956. He had ordered one hundred 1957 Mercurys under the expectation, he stated, that Commercial Credit would supply financing. Ford allocated eight new cars to appellee, but reference is made only to the delivery of seven in this suit.

From November 7 to 14, Ford, by reason of blundering between it and appellant, delivered the seven new Mercurys from its plant in Michigan to appellee's Altoona premises. Ford had erroneously charged appellant's Detroit purchasing office for these cars. And even though appellant's Altoona office had sent its Detroit office the terminating papers relating to appellee's account, the Detroit office compounded Ford's mistake. It paid for the seven 1957 models.

Appellee claimed it sent two of the seven cars to other dealers in the vicinity who had been unable to secure new models. How appellant was compensated for them is not revealed in the testimony. The trial dealt with the disposition of the remaining five cars.

The Altoona office of the appellant received from Ford "notices of transactions purchased" with attached copies of the invoices sent to the appellee, which informed it that appellant had financed the purchase of Mercury cars for the appellee. The testimony fails to show exactly when such papers were received in Altoona, but it appears that they arrived

3. The only tangible evidence of information on this subject is contained in the following memorandum:
"Mr. C. B. McLaughlin,
Altoona, Penna.
Pittsburgh Division
cc: Mr. C. S. Kreiling,
Pittsburgh Division
10–11–56
Re: Bruce Lincoln Mercury
"I have checked with Mr. Kreiling and Mr. Brown, and neither authorized your picking up the floor planned cars from Bruce Lincoln Mercury.
"Whenever W/S is to be taken over from another company, Division can authorize this, if it is within their authority. However, in this particular case, the authority would have had to have been secured from Corporate Credit Department.

"Now that we are in this, make certain that you have complied with all the steps listed in Credit Manual 'W/S, taken over from other Financing Institutions' and W/S, direct advance new and used.
"Make certain that no additional W/S is picked up from any dealer, unless Division, and or Corporate Credit, specifically authorizes the purchase of the W/S.
"Forward Universal CIT's experience on this account.
"E. K. Dayton
"Divisional Credit Manager
"mls"

4. Where a customer of appellee applies for credit to finance the purchase of a car from it Commercial Credit advances such credit based primarily on an analysis of the purchaser's credit rating.

two or three days after the actual transactions in Detroit.

After the Altoona office received a notice of a transaction purchased with an attached copy of invoice, it prepared, in the regular course of business either that day or on the next, a billing consisting of a wholesale discount and payment record on the reverse side of which is a trust receipt. There were three such billings covering the five cars in question. It mailed one copy of the billing to the dealer, sent two to its accounting department, and retained one itself. Appellee disclaimed ever reciving such information.

The wholesale discount and payment records disclosed, among other things, that appellant paid Ford for one Mercury on November 7, one on November 9, and three on November 13, and that the dates upon which appellee was to make a payment on the purchase price of these cars, unless sold at an earlier date, were respectively February 7, 9, and 13, 1957.

The trust receipt provided that the appellee should hold the cars in trust for the appellant and contained, among other things, the following clauses:

\* \* \*

"Universal C.I.T. may at any time repossess said chattels, and we agree on demand to return them in good order and unused.

"Upon default we agree to return the chattels to Universal C.I.T. forthwith without demand. \* \* "

\* \* \*

Though the trust receipt has a place for the authorized signature of appellee, no signature of any kind appears thereon.

About November 13, 1956, Mr. Mather, having become aware of the receipt of the notice of transactions purchased immediately apprised the Pittsburgh division office "that these cars had come in and asked them what their procedure was going to be in handling them." The division office, related Mr. Mather, asked him "to go out and see Bruce and see if he couldn't sell those cars or get some-

body else to take them on a wholesale basis."

On November 13, 1956, Mr. Mather also instructed William R. Figura, appellant's branch manager in Altoona, to call Commercial Credit to find out if it would reimburse appellant. This was done and Mr. Figura testified that Commercial ·Credit "didn't actually know" whether it was going to pay appellant for the new cars. Finally, on November 15, as a result of further conversations with Commercial Credit, Mr. Figura understood that it would decline to finance the new cars.

Mr. Mitchell testified that Mr. Figura had told him to make a wholesale commodity check of appellee on November 14. He stated that after doing this he received two checks from the bookkeeper, Mr. Oessinich, in payment for three cars since Mr. Lingenfelter had already sold them. Mr. Lingenfelter was the drawer on one check, payable to Universal C.I.T. for $5,362.00, and Mr. Walter Bohn was the drawer on the other, payable to Universal C.I.T. Credit Corp. for $2,898.69. The date on each check was not November 14, but November 15.

Employees of U.C.I.T. asserted that they went to appellee's showroom on November 15 to seek reimbursement for the two remaining 1957 Mercurys. They testified that they were unsuccessful and waited there the entire day until the arrival of Mr. Mather in the early evening; that Mr. Lingenfelter of his own volition sold the two remaining Mercurys to car dealers Albert J. Bianchini of Point Auto Sales and Benny Decosky of Lakemont Motors; and that appellee had the car dealers make appellant the payee of the check for the two Mercurys since the money was owed it for inadvertently financing the new Mercurys.

Appellee's witnesses describe the events of mid-November differently than appellant's witnesses. Mr. Lingenfelter denied ever receiving any notification from appellant informing him that it had financed the five new Mercurys. Moreover, he insists that the three new Mer-

curys were sold in his showroom not on November 15, but on November 14.[5]

He testified that there were five new 1957 models on his premises when he walked into the showroom at about 9:00 a. m. on November 14. Appellant's employees, Figura, Mitchell and Allison, were there. In answering a question at the trial whether any of these gentlemen told him why they were there, Mr. Lingenfelter commented: "No, sir, never told me nothing. I thought they were there to see the new model cars."

About twelve o'clock noon Mr. Lingenfelter drove to Evansburg Auto Auction to sell some of his old inventory. This would, he declared at trial "make room and also * * * make ready cash available. * * *"

Upon returning to his Altoona dealership, about 2:30 p. m., he observed that the appellant's employees were still there. One of his salesmen, according to Mr. Lingenfelter, then told him: "You got trouble here for something. You are not allowed to sell a new car." Mr. Lingenfelter reacted to this by speaking to Mr. Figura, who then purportedly told him, without offering any explanation: "No, you are not allowed to sell a new car."

Mr. Lingenfelter thereupon called his attorney, Harold Miller, asking him to come to the showroom. According to Mr. Miller, Mr. Lingenfelter was unable to adequately explain the trouble; he merely indicated that there was some difficulty "about his loan", hence he wanted his attorney there.

Mr. Lingenfelter observed at the trial:

"So he [Mr. Miller] came out and I guess they didn't give him any explanation at all about this, but they said they were waiting for Adrian Mather to come in. In the meantime, they kept making phone calls. * * * So Harold Miller stayed right with me trying to figure out what was going on. And we all went out to supper * * * We come back and I was trying to figure

out what was the matter. I just couldn't put my finger on it. And, actually, I don't think they knew. Maybe they did. I don't know, but in the meantime this—Mather showed up. * * *"

About 3:00 p. m. of the same day Mr. Mather was attending a meeting in the division office at Pittsburgh when he received a message that Mr. Figura had telephoned for assistance in obtaining a check from Mr. Lingenfelter for the new Mercurys at the appellee's showroom. Mr. Mather left Pittsburgh about 4:00 p. m. and arrived at the appellee's dealership in Altoona about 7:30 p. m.

Before his arrival he stopped to eat at Rustic Isle, a tavern on the outskirts of Duncansville. While there Mr. Mather met George W. Bixler of Brumbaugh Company, Inc., who was both a dealer in new and used cars and manager of the Evansburg Auto Auction. Mr. Bixler testified that Mr. Mather had offered that morning at Brumbaugh Company, Inc. to sell him the new Mercurys at Mr. Lingenfelter's dealership for the invoice price. This offer was refused. During the conversation at the Rustic Isle, Mr. Mather, who according to Mr. Bixler had been drinking, reiterated in a loud manner the earlier offer, which Mr. Bixler refused again. There were others present at the bar-restaurant close enough to hear the talk, including Mr. Decosky.

Both Mr. Miller and Mr. Lingenfelter testified to the effect that Mr. Mather entered the showroom in a manner disclosing loudness and nastiness and that he had been drinking. Mr. Lingenfelter estimated that there were "25, 30 maybe 40, 50 people" in the showroom before Mr. Mather entered his place. Mr. Lingenfelter stated that he "was nervous and all shaken up" at that moment. Mr. Mather contended, according to Mr. Lingenfelter: "These are my cars. You are not selling them here. I am going to take them." Immediately thereafter some used car dealers followed Mr. Math-

---

5. Contrariwise, appellant's witnesses insist that it was not three new Mercurys but two that were sold in the showroom not on November 14 but on November 15.

er in. Mr. Lingenfelter related that he recognized Mr. Decosky who, it will be recalled, was at the Rustic Isle that afternoon; Mr. Bianchini, and someone from Cove Auto Sales, whose name Mr. Lingenfelter was unable to recall.

Here it should be noted that Mr. Bianchini had bought a car from Mr. Lingenfelter that day at Evansburg Auto Auction. He also conversed with Mr. Lingenfelter at the auction as to whether there were any more used automobiles available at appellee's premises. Later Mr. Bianchini contacted Mr. Decosky, with whom he had a standing agreement to pool funds in order to negotiate purchases of automobiles that one of them would be unable to handle individually. They decided that they would visit appellee's premises to see if Mr. Lingenfelter had some units to sell.

They went to his used car lot, about half a block from the new car dealership, where a car salesman told them that Mr. Lingenfelter was "at the new car business place." Mr. Bianchini and Mr. Decosky walked over to the new car establishment. Upon entering the showroom they saw various people including Mr. Lingenfelter and Mr. Mather, who, Mr. Bianchini testified, "seemed like to me he was running the show."

Mr. Lingenfelter stated that he had informed Mr. Mather: "I got these cars sold * * *" Nevertheless, Mr. Mather, according to Mr. Lingenfelter, replied: "Well, I am pulling them out, * * *. I am going to sell these cars and I am going to sell them right now."

The testimony does not reveal the precise time when Mr. Lingenfelter became aware that appellant had financed the 1957 Mercurys. But Mr. Lingenfelter testified in response to a question by the Trial Judge: "Well, I guess I found out when he [Mr. Mather] said he wanted the cars that night on November 14th."

Mr. Miller's testimony, in general, merely repeated Mr. Lingenfelter's version of the occurrence. Mr. Miller added that he told Mr. Lingenfelter to bar the exit room of the showroom so that the cars could not be removed. As for getting an explanation, Mr. Miller testified that Mr. Mather's manner was such "[t]here was no talking to Mr. Mather that evening."

Harry Green testified that during the commotion he was sitting in a new Mercury which Mr. Lingenfelter told him he could buy. One of appellant's employees then walked over to Mr. Green and told him to get out of the car. Mr. Green protested that the car was his, but appellant's employee exclaimed: "I told you to get the hell out of the car." He got out of the car and complained to Mr. Lingenfelter who said that he was sorry but there was nothing he could do. Mr. Green did not buy a car from Bruce Lincoln, but thereafter bought one from another dealer.

Messrs. Lingenfelter, Miller, Bianchini, Decosky and the four representatives of U.C.I.T. finally walked into Mr. Lingenfelter's office, located off the showroom. Mr. Lingenfelter stated that Mr. Mather threw the invoices down on a table and told Messrs. Bianchini and Decosky that if they paid him the invoice price on the two Mercurys, they could have them. Messrs. Decosky and Bianchini accepted the offer. Mr. Decosky wrote a check for $5,355.36 for himself and partner. U.C.I.T. was the payee; the date of the check was November 14.

Mr. Lingenfelter further testified that he refused to sign any papers, but Mr. Mather told him to sign or else U.C.I.T. would see to it that he would "never have any credit or any business dealings in Altoona" as long as U.C.I.T. remained there; and that "I signed the papers because they are a big outfit and I am just Bruce Lingenfelter."

When new automobiles are sold in Pennsylvania, a dealer must sign an RV T–1–A Assignment of Title form so that the buyer can get a certificate of title from Harrisburg. Mr. Bianchini insisted that he and Mr. Decosky needed Mr. Lingenfelter's signature on two such forms in order to insulate themselves against adverse claims on the title to the

Mercurys. Mr. Lingenfelter thereupon signed the forms.

Mr. Bianchini expressed the view that he knew these cars were a steal at the invoice price, since one could easily sell the two new Mercurys to other dealers at a profit. The next day Messrs. Bianchini and Decosky took the cars to the Manheim Auto Auction, near Lancaster, Pennsylvania, where they realized a profit of about $700 on the resale of these cars to a Mercury dealer from York, Pennsylvania.

Appellee, in contradistinction to the testimony offered on behalf of appellant, maintains that not two Mercurys were sold on the subject evening, but three. In enumerating the three parties who purchased the cars in the showroom that evening, Mr. Lingenfelter testified:

"A. The-the parties? That was Bernie Dakoski [sic]; that was Lakemont Motors, he sold him one, and Mr. Bianchini, Point Auto Sales, and also Cove Motor he sold them. I don't know who that represents, but that is the name they go under, Cove Auto Sales."

While there was no direct evidence that Walter Bohn represented Cove Auto Sales, there was at least the implication that he was the man from Cove Auto Sales who appeared on appellee's premises.

Appellee contends that during the Decosky car selling episode, appellant "further collected for the other two automobiles" a check, dated November 15, 1956, for $5,362.61, made by Mr. Lingenfelter to appellant. Scrutiny of the testimony, however, fails to reveal any evidence bearing on the delivery of this check on that occasion.

It was stipulated at trial that the check Mr. Lingenfelter made to appellant for $5,362.61 and dated November 15, 1956 was in payment for the two cars that Leonard Wilson and Mr. Benton purchased.

On November 20, 1956, Mr. Wilson gave appellee his 1955 Mercury and a check for $1,571.63, for one of the two new Mercurys. It was adduced at trial, however, that he was "given the 1957 Mercury about five or six days" before the date of payment.

George L. Benton, Vice President of the Altoona Bank and Trust Company and brother of Harry C. Benton, one of the original stockholders of appellee, testified that he purchased his 1957 Mercury from appellee "three days before the showing".

Thus we conclude that Mr. Lingenfelter was mistaken when he stated that there was five 1957 Mercurys on his premises on the day he alleges Mr. Mather sold the cars in his showroom. Patently the car sold to Mr. Benton was not there. We are left in the dark as to when actual delivery was made of the Wilson car. Neither are we informed with any reasonable degree of certainty when Mr. Bohn received his car or whether he was a used car dealer from the Cove Agency. And as for the contention by appellee that a car was sold to the Cove Agency at the time of the Decosky sale, there is no evidence connecting the representatives of appellant with any such sale. Accordingly concern in this case is reduced to the actions of appellant's representatives with regard to the two Mercurys sold to Messrs. Decosky and Bianchini.

In August or September of 1956, Mr. Harry C. Benton resigned as secretary-treasurer of the appellee and sold his stock to Mr. Lingenfelter. However, his obligation continued as one of the guarantors of the balance due on the demand judgment capital note of $10,000. On October 26, 1956, Mr. Kline also sold his interest in the appellee to Mr. Lingenfelter. Meanwhile Mr. Lingenfelter had invited his uncle, Bruce Hileman Lingenfelter, to invest some money in the corporation for which he received stock. At the time of the mid-November incident Mr. Lingenfelter owned two thirds and his uncle one third of appellee's stock.

After the sale of the Mercurys Mr. Lingenfelter testified that he had to get a line of credit in order to obtain new cars but everyone was "down on him".

"It just kept deteriorating from there on and eventually I had to sell the business," he contended at trial. On December 7th Mr. Lingenfelter sold his business for "approximately $20,000".

---

The trial of this case consumed eleven days. Torrents of words flowed through the courtroom. We have made no attempt to recite the myriad details of the assertions put forward by the parties. Rather, we have canvassed only the essentials of the complicated and voluminous fact pattern. We turn now to a discussion of the germane law.

The tort of interference with prospective advantage developed at an early date, in cases having to do with physical violence, or threats thereof to drive away customers from the plaintiff's market.[6] Temperton v. Russel [7] is the real source of modern law on the tort of interference with prospective advantage.[8] There, the court decided, according to Prosser and Smith,[9] that the principle of liability for interference with contract extended beyond existing contractual relations and that a similar action would lie for interference with economic relations which were merely prospective or potential.

■ Although the law extends its protection further in the case of interference with existing contracts than in precontractual interference, it draws a line beyond which no member of the community may go intentionally intermeddling with the business affairs of others.[10] The interest protected is reasonable expectation of economic advantage.[11] Harper and James state:

"This, of course involves society's [wish to afford] * * * the individual a fair opportunity to conduct his legitimate business affairs without interruption from others except in so far as such interferences are sanctioned by the 'rules of the game' which society has adopted." [12]

■ In naming the tort that interferes with a businessman's prospective economic gain, Dean Prosser uses the term "interference with prospective advantage" to cover many kinds of situations.[13] Harper and James use the term "interference with reasonable economic expectancies".[14] The Restatement uses the less general term of "inducing refusal to deal".[15] The Pennsylvania Courts use the Restatement term.[16] Under Erie R. Co. v. Tompkins [17] we must follow the Pennsylvania substantive law applicable to the instant case.

■ To perpetrate the tort of inducing refusal to deal the defendant must act:

" * * * (1) for the purpose of causing this specific type of harm to the plaintiff, (2) such act must be unprivileged, and (3) the harm must actually result." [18]

---

6. Prosser and Smith, Cases and Materials on Torts, p. 1145 (3rd ed. 1962). An early statement of this principle is found in Keeble v. Hickeringill, 11 East 574, 103 Eng.Reps. 1127 (1707) where, owing to the defendant's malicious firing of guns to frighten ducks away from plaintiff's pond, plaintiff was unable to take them for his intended commercial purposes.

7. 1 Q.B. 715, 62 L.J.K.B. 412 (1893).

8. Prosser and Smith, supra note 6.

9. Ibid.

10. 1 Harper and James, The Law of Torts, § 6.11, p. 510 (1956).

11. Ibid.

12. Ibid.

13. Prosser on Torts, § 107 (2nd ed. 1955).

14. Supra note 10.

15. Restatement, Torts, § 766 (1939).

16. Birl v. Philadelphia Electric Co., 402 Pa. 297 at 300, 167 A.2d 472 at 474 (1960); Capecci v. Liberty Corp., 406 Pa. 197 at 202, 176 A.2d 664 at 666 (1962) cites Birl v. Philadelphia Electric Co. with approval.

17. 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1930).

18. Birl v. Philadelphia Electric Co., supra note 16. Here, the court based its decision on Restatement, Torts, § 766 (1932), which provides the following general principle:
"Except [for certain premarital situations] * * *, one who, without a privilege to do so, induces or otherwise

14

Bruce Lincoln drew the allegations of its complaint in a general manner. It neglected to specify trenchantly the theory of its case.[19] Giving Bruce Lincoln every reasonable inference under our liberal system of pleadings, we must conclude that the gist of its argument, as it relates to the calling of the note on September 19 and the car selling incident of mid-November, is founded upon the following notion: that U.C.I.T.'s actions detrimentally interfered with and destroyed Bruce Lincoln's business by inducing prospective customers or financing agencies to refuse entering into or continuing business with Bruce Lincoln.

■■ For a wrong to be actionable it must appear, among other things, that actual damage and loss have been occasioned by the wrong.[20] While it need not be absolutely certain that prospective economic advantage would have been achieved were it not for such interference, a reasonable assurance thereof, in view of all the circumstances, is required.[21]

If actual harm occurred, appellee could have shown:

"a background of business experience on the basis of which it is possible to estimate with some fair amount of success both the value of what has been lost and the likelihood that the plaintiff would have received it if the defendant had not interfered."[22]

We are aware of appellee's argument that injury to its reputation brought about prospective economic loss. This claim remains hollow under the circumstances of this case, unless there was a basis to conclude that pecuniary loss resulted from damages, if any, to appellee's reputation.[23]

The first issue presented is whether there was a basis in the record to determine that appellant, on September 19, 1956, called the balance on the $10,000 capital judgment note, in such a manner as to commit the tort of inducing refusal to deal.[24]

Even if it is assumed that appellant demanded payment of the balance of the

purposely causes a third person not to * * * enter into or continue a business relation with another is liable to the other for the harm caused thereby."

19. The essence of the complaint averred: "By reason of the wilful and malicious acts of the defendant, plaintiff has been forced out of business, has incurred operating losses [and] has failed to receive accounting from the defendant of moneys due and owed * * *"

20. See Locker v. Hudson Coal Co., 87 Pa. Dist. & Co. R. 264, 267 (1953), cited with approval in Capecci v. Liberty Corporation, supra note 16.

21. See Lewis v. Bloede, 202 F. 7, 24 (4 Cir. 1912); Goldman v. Feinberg, 130 Conn. 671, 37 A.2d 355 (1944); and 86 C.J.S. Torts § 43, p. 959 (1954).

22. See Prosser, supra note 13, § 107, pp. 746–747.

23. Authority exists for compensating a plaintiff corporation in a defamation action wherein it does not show pecuniary harm but there is a defamation per se; as the law in those circumstances will assume an economic loss. See 86 A.L.R., Libel and Slander, § 146 (1933). Restate-

ment, Torts, § 561(1) (1938), and Prosser, supra note 13, § 93. Plainly, by virtue of appellee's complaint and the issues posed at the trial, the instant case does not present an action for defamation.

24. For discussion on the right of an individual to sue for *invasion of privacy*, wherein an actor has employed unreasonable debt collection methods, see Commentary, Torts-Rights of Privacy-Unreasonable Debt Collection Methods, 2 Vill.L. Rev. 238 (1957) and Torts-Invasion of Right of Privacy-Libel, 13 Pitt.L.Rev. 435 (1952).

Dean Prosser, in speaking about words and acts causing *mental disturbance*, declares: "In recent years the high pressure methods of collecting creditors * * * have met with disfavor on the part of the courts." Supra note 13, § 11, pp. 42–43 (2nd ed. 1955).

These writers contemplate harmful effects upon individuals. A corporation such as appellee can be neither susceptible of having its mentality disturbed nor its privacy invaded under the circumstances of this case. Such issues were never raised in appellee's complaint and in the Trial Court.

$10,000 note on the night of September 19 for the purpose of causing [25] customers or financing agencies to refuse entering into or continuing business with appellee and that appellant's actions relating thereto were not privileged,[26] appellant's liability is not conclusively demonstrated. Appellee must still show that there was a likelihood it would have received a prospective economic advantage if appellant's representatives had not acted in the manner they did on September 19.

Appellee alleges that by reason of the boisterous manner in which Messrs. Bennett and Mather demanded payment of the balance due on appellee's $10,000 note, in the presence of other patrons of Stover's Restaurant at about 11:30 p. m. on the night of September 19, 1956, it suffered damages. The jury would have to indulge in sheer guesswork to infer, from these circumstances alone, that the appellee encountered disability in obtaining credit and customers.

Appellee did not offer any proof manifesting a likelihood that it would have received credit, a single additional sale, or some other business advantage, if appellant's representatives had not demanded payment of the note in the fashion described. The evidence merely discloses that appellee paid the note and informed appellant on the very next day, September 20, that it was terminating their business relationship. Furthermore, it was adduced at trial that appellee previously had approached Commercial Credit with the hope that it would take over the credit arrangement carried by

appellant. And by October 3, 1956, Commercial Credit had granted appellee's request in writing.

Appellant's representatives may have acted in the poorest of bad taste in rudely directing appellee's officers to assemble at so late an hour, and their demand for payment may have been couched in very uncouth, loud, and boisterous terms. They may have been entirely mistaken in their apprehension that appellee had given them a check for which there were insufficient funds. Their feeling that appellee had violated the terms of its contract in failing to remit the proceeds of sales of new cars promptly seems to have been on firmer grounds. Even if it were not, there is no reasonable showing, founded on inferences legitimately and properly deducible from the evidence, that appellant's demanded payment of the $10,000 note late at night at Stover's Restaurant in the presence of other patrons occasioned any loss on the part of appellee.

Accordingly, there was no basis to rule that the actions of appellant's representatives, on September 19, 1956, induced a refusal to deal with appellee in deprivation of its prospective economic advantage.

Whether the record supported a determination that appellant's actions of mid-November were such that it committed the tort of inducing refusal to deal is the second issue.[27]

Appellee has by implication attempted to put forth the idea that Commercial Credit refused to advance it credit be-

---

25. "For the purpose of causing" refers to situations in which A leaves B no choice but to act in a certain manner, even though A's paramount purpose may be to induce some other end. Restatement, supra note 15, p. 55.

26. The law has not crystallized a complete set of rules defining the existence of privilege as it applies to the tort of inducing refusal to deal. Restatement, supra note 15, § 767, p. 63. If, however, the interest which defendant seeks to advance is "superior to the interest invaded in social importance," defendant's acts are

privileged. Harper and James, supra note 10, § 6.12, p. 514; also see Prosser, supra note 13, § 16. But cf. Restatement supra note 15, § 767.

27. There is a tendency in the arguments of the appellee to suggest that there were "cumulative" aggressive acts upon the part of the appellant between the note collecting and car selling incidents, alleged to have occurred September 19, 1956 and November 14–15, 1956. The record fails to disclose any act directed by appellant toward appellee in the interim.

cause of the alleged occurrence at appellee's showroom on November 14, 1956.[28] Appellant maintains that the occurrence at appellee's showroom took place on November 15. It should be noted that confusion existed in general at the trial whether the sale of the Mercurys happened on November 14 or 15.[29]

Mr. Lingenfelter testified that he visited the Evansburg Auto Auction on the day Mr. Mather allegedly sold the Mercurys in appellee's showroom. Mr. Bixler, manager of the Evansburg Auto Auction and appellee's witness, testified that he went to his auction on Thursday, the day of the sale of the Mercurys in appellee's showroom. Mr. Bianchini, appellee's witness, tesitfied that he and Mr. Decosky bought the two new Mercurys at appellee's showroom on Thursday, the day Evansburg Auto Auction conducts its auction. Identifying the day, Mr. Bianchini said: "The date of November 14 * * * was on a Thursday, sir. * *." This was manifestly wrong for Thursday, was not November 14, 1956, as urged by appellee, but November 15, 1956. Moreover, Mr. Bianchini testified that on the "next day, Friday [November 16, 1956]", he and Mr. Decosky took the two Mercurys to the Manheim Auto Auction, near Lancaster, where "they have their auctions on Friday." Since it is clear that the Mercurys were sold from appellee's premises on the evening of Thursday, November 15, any inference that Commercial Credit denied financing to appellee because of the car selling incident is baseless for its letter of denial to appellee was dated that very day, November 15, 1956.

Even assuming that the car selling incident happened not on November 15, 1956, but on November 14, 1956, there is no evidence from which it can be reasonably inferred that any act of appellant prompted Commercial Credit to deny appellee financing service. The testimony discloses that on October 3, 1956, Commercial's Altoona branch notified appellee that it had accepted the agreements for financing executed by appellee on September 25, 1956. Commercial's Pittsburgh division, the next higher authority, immediately commenced an analysis of appellee's financial condition. After determining that appellee had a deficit net worth for the period of March 20 to July 31, 1956, it decided to refuse appellee's financial service beyond the liquidation of the outstanding indebtedness. Notification in writing of this decision was sent from the Pittsburgh office under date of November 15, 1956.

Mr. Kreiling, assistant divisional manager of Commercial's Pittsburgh office and a member of the committee declining appellee's account testified:

"Q. [appellant's counsel] Why did you decline the account, sir?

"A. Because in our credit analysis we didn't feel he [appellee] was sufficiently financed for us to carry it for the extension of this much credit."

At another point in the testimony Mr. Kreiling said that Commercial was unwilling to further finance appellee "[b]ecause we didn't feel that his [appellee's] financial condition is worthy of as much credit as he has applied for."

A conclusion that the actions of appellant's representatives on the evening of November 14, assuming that this was the date of the car sale, caused Commercial Credit Corporation to reject appel-

---

28. In its brief, appellee states:

"The testimony shows that the happenings of the showroom of the Plaintiff's on November 14, 1956 became widely circulated throughout the town and that the Plaintiff was unable to get credit any place. On November 15, 1956 the Pittsburgh office of Commercial Credit Corp. was in the process of revoking its agreement to floor plan new cars."

29. The confusion is by no means diminished by the reason that Mr. Decosky's check of $5,355.36 to Universal C.I.T. for two 1957 Mercurys was dated November 14, 1956; that the date of Mr. Lingenfelter's check of $5,362.61 to Universal C.I.T. for two 1957 Mercurys was November 15, 1956; and that Mr. Bohn's check of $2,898.69 to Universal C.I.T. for one 1957 Mercury was November 15, 1956.

lee's application for financing would be sheer conjecture. Assuredly, a deduction finding such cause and result would be an unreasonable inference on the basis of nothing more than the testimony asserting that the car selling incident took place on the evening of November 14; that Commercial refused to advance credit on November 15; and that Commercial's assistant manager stated its refusal to finance appellee was because of appellee's weak economic position.

The appellee further sought to show that the car selling incident of mid-November caused it to lose the opportunity to obtain financing from its bank the Central Trust Bank of Altoona, later merged into the Altoona Bank and Trust Company. It asserts that by reason of the means adopted by appellant's representatives in securing payment for the 1957 Mercurys on the showroom floor, its reputation immediately became so tarnished that the bank regarded it as a bad credit risk.

George L. Benton, vice president of the bank and appellee's witness, testified somewhat ambiguously as to whether the bank refused credit to appellee because of the car selling incident on appellee's premises.

Scrutiny of Mr. Benton's testimony reveals that at no time did Mr. Benton indicate that the bank discontinued its floor plan of used cars with appellee on account of the car selling incident. He simply stated that the bank decided to seek payment for the used cars after the occurrence at the appellee's premises and thereafter appellee was unable to floor plan used cars with the bank. The reason therefor—perhaps poor financial standing of appellee or the embarrassment, if any, engendered by the events at appellee's dealership—is not given at that point of the direct examination.[30]

But a little later in the direct examination, Mr. Benton denied that the car selling incident affected the bank's decision concerning the credit of the appellee.

"Q. As a result of the occurrence on November 14th, did your bank take any action with respect to the credit of Bruce Lincoln-Mercury?

"A. No, sir."

The essence of Mr. Benton's testimony is that the appellee could not secure financing for its used cars after the mid-November car selling incident, but as a result of this incident the bank had taken no action in relation to appellee's credit. In light of this it would be theorizing on an assumed factual premise beyond the scope of the evidence to decide that the action of appellant's representatives concerning the car selling occurrence induced the bank to refuse the granting of credit or any other prospective economic advantage to appellee.

The relationship of appellee and appellant to the five mistakenly delivered Mercurys presents various problems. If we, however, bear in mind that the present dispute focuses on the right to these cars between only appellant and appellee, our difficulties become somewhat simplified.

---

30. Mr. Benton stated on direct examination:

"A. I had cars floor planned with Bruce Lingenfelter. Automobiles, used automobiles, up until the day he went out of business. [On December 7, 1957, Mr. Lingenfelter sold his business.]"

\* \* \*

"A. \* \* \* After the situation [the car selling incident] occurred, I was instructed by the Board of Directors to see that the used cars we had floor planned was paid in full. I contacted Bruce, and Bruce arranged to take the automobiles to the Evansburg—to the Evansburg Auction to dispose of them and pay our loan in full.

"Q. Up until that time, what had been the relationship with your bank and Bruce Lincoln-Mercury creditwise?

"A. Excellent."

\* \* \*

"A. I have already stated that the Board of Directors asked me to get the loan paid in full."

\* \* \*

"The Court: \* \* \* The question is, did the dealer have any further business connection after that time. Answer either yes or no. It is a proper question.

"The Witness: No, sir."

The sales provision of the Uniform Commercial Code [31] have altered some of the formerly established doctrines of contract law in order to react more positively to the realistic needs of modern commerce.[32] It is beyond dispute, nevertheless, that a sales contract must be made in a manner sufficient to show agreement.[33]

It is undisputed that Ford erroneously charged appellant's Detroit office for these five 1957 Mercurys and that appellant's Detroit office erroneously paid for these five cars. Two or three days after the transaction in Detroit, appellant's Altoona office received the notice of transactions purchased informing it that the Detroit office had mistakenly paid for the five Mercurys. Since appellant's office paid for one Mercury on November 7, 1956, one on November 9, and three on November 13, the earliest appellant's Altoona office could have received a notice of transactions purchased was November 9. The testimony showed that the last notice of transaction arrived on about the day of the car selling incident, November 15.

When the Detroit office paid for the five Mercurys it is clear that it had no intention of creating a financing relationship. Mr. Lingenfelter testified that he was under the impression that Commercial Credit had financed the 1957 Mercurys, even though the Ford sent invoices accompanying the cars indicated that appellant had paid for these cars. Therefore, since appellee had not made an offer to appellant to finance these five cars and appellant had not issued an acceptance, it is clear that as yet no contract for financing existed between the parties. As between appellee and appellant, appellee was merely mistakenly in possession of the cars and invoices.

After appellant's Altoona office received a notice of transactions purchased, it mailed to appellee in the regular course of business a copy of a billing consisting of a wholesale discount and payment record on the reverse side of which was a trust receipt. It could be argued that this objective manifestation, notwithstanding any subjective intent, communicated an offer to appellee. Yet appellee denied ever receiving any such billing. Moreover, there is a place for the authorized signature of appellee on the trust receipt. No signature, indicating acceptance of the terms of the billings appears thereon. To have a contract for financing, there must be, among other things, the requisite mutual assent to the same bargain. Accordingly, there was no formation of a financing contract.

Mr. Lingenfelter at all times testified that until the evening of the car selling incident he thought Commercial Credit was financing the five 1957 Mercurys. Hence, regardless of appellant's objective manifestations, it must be held that Mr. Lingenfelter never intended to accept appellant's offer, if any, and that his conduct never reflected the recognition of a financing contract's existence wherein appellee would own the 1957 Mercurys.[34] This fact is certain whether the broad frame of reference in the Sales Article of the Commercial Code or the more conservative ordinary contract law sets the standard.[35]

Appellant and appellee have made reference to the Secured Transactions provisions of the Commercial Code.[36] This section seeks to make the rules relating to secured transactions, regardless of technical names individuals may give to their negotiations, as uniform and clear as circumstances of this field allow.

31. Purdon's Pa.Stat.Ann. tit. 12A, § 2–101 et seq. (1954).

32. See Dechert and Brennan, The Pennsylvania Uniform Commercial Code, Purdon's Pa.Stat.Ann. tit. 12A, XXXIII, XL (1954).

33. Purdon's Pa.Stat.Ann. tit. 12A, § 2–204 (1), (1954) and see supra note 32.

34. See Purdon's Pa.Stat.Ann. tit. 12A, § 2–204(2) (1954).

35. Cf. Simpson on Contract, Offer and Acceptance, § 9 (1954) with Purdon's Pa. Stat.Ann. tit. 12A, §§ 2–201, 2–204, 2–205, 2–206 (1954).

36. Purdon's Pa.Stat.Ann. tit. 12A, § 9–101 et seq. (1954).

■ The principal test whether a transaction comes under the Secured Transactions Article is: is the transaction intended to have effect as security?[37] Appellant and appellee, as already discussed, palpably were without any subjective or objective intention that the circumstances of the mistaken delivery of the 1957 Mercurys should have effect as any kind of relationship, security or otherwise. Consequently, the arguments pertaining to the Secured Transactions rules of the Commercial Code with reference to appellant and appellee lack relevancy to the status of the five Mercurys. Appellee was only in naked possession of these cars as between itself and appellant.

When appellant's representatives received reimbursement for the invoice prices paid for the cars, allegedly during the car selling incident, by way of Mr. Lingenfelter's check for $5,362.61 for the sale of the two 1957 Mercurys to Messrs. Benton and Wilson, it was merely obtaining what rightly belonged to it. And when appellant's representatives allegedly induced the sales of the two 1957 Mercurys to Messrs. Bianchini and Decosky, it again recovered what rightly belonged to it—the invoice prices.[38]

■ Their methods may have been harsh. Yet in a suit for inducing refusal to deal, appellee must show the likelihood of interference with prospective pecuniary profit.[39] Since appellee had no right to these five 1957 Mercurys —they were strictly a windfall—it lacks basis to claim that it should have been able to receive an economic gain by a sale of these cars. This remains true even though Mr. Wilson testified that he would have bought one of these 1957 Mercurys from appellee. For if appellee's claim that it was entitled to realize a profit by the sale of these Mercurys is incorrect, it matters little, as between appellant and appellee, that appellee had a prospective buyer for one of the 1957 Mercurys.

Appellee made strong claims that its business future was an assured success despite the heavy losses sustained during the first eight months of its existence. The testimony, however, viewed in the light most favorable to appellee, fails to establish this point.

Mr. Lingenfelter hoped to "break even" before the showing of the new 1957 Mercury in mid-November, although he admitted operating an unprofitable business.[40] It was adduced at trial that except for the period of about mid-March to May 1, 1956, appellee's business showed a loss each month to about mid-November of 1956. Mr. Lingenfelter sold his business on December 7, 1956 for "approximately $20,000".

37. Uniform Commercial Code Comment, Purdon's Pa.Stat.Ann. tit. 12A, § 9–102, p. 335 (1954).

38. Appellee in its complaint and brief, and the Trial Court in its post judgment opinion, stated that Mr. Mather auctioned the five cars to used car dealers, implying an effort to get the highest price for them. The record is barren of such evidence. At no time did appellant's representatives seek to recapture more than the invoice prices it had paid for the cars.

39. See supra notes 20, 21, and 22.

40. On re-cross examination Mr. Lingenfelter testified:
"Q. Was your business operating at a profit?
"A. I can't say that it was operating at a profit.

"Q. Do you know, sir?
"A. Because it was at the end of the '56's. I knew if we broke even I would be very happy.
"Q. You were in business to break even?
"A. At the end of that model, yes, sir. I expected to lose money, to tell the truth.
"Q. Do you know whether or not you were making a profit during the time you were in business?
"A. On cars? That was my business.
"Q. Your total business?
"The Court: Business——
"A. I would say no.
"Q. You were not running a profitable business?
"A. I excepted to lose business."

Temporarily putting aside the conclusion that appellee never introduced sufficient evidence to show it could obtain financing for the purchase of 1957 Mercurys, it should be noted there was testimony that some dealers made a profit from the 1957 Mercury. But the purported amount of profits, the circumstances of the dealers making the profits, and any estimate of the percentage of dealers making a profit were not given.

Appellee emphasized the large volume of new and used cars it sold from March to November. Anticipating the introduction of the new 1957 Mercury in which there was a complete change over in the styling and design, it hoped that the business already built up would promote the sale of the new Mercury into a substantial business profit.

The difficulty with this argument is that the evidence unmistakenly disclosed that the business was not "built up" but "slid down". It is illusory to import a value to a business by reason of the sale of many cars without regard to whether net profit resulted. The statement that some dealers made a profit on the 1957 Mercurys, unsupported by any details relating thereto, taken together with a large car sale volume without a profit presents no basis for a reasonable inference that appellee's business would yield economic advantage in the future. That the future would begin in the highpoint of the car season for dealers—when the new models became available—does not alter this conclusion.

The truth of the situation was that appellee had lost, as the season for the 1957 model approached, much of the capital invested therein. Testimony as to the amount invested by Messrs. Lingenfelter, Harry C. Benton and Kline is a jumble. Yet it is incontrovertible that the investors had each suffered a loss. Appellee was unable to acquire financial service because any intelligent analysis would disclose its precarious fiscal position. How Joseph Burdis, Jr., former zone manager of the Ford Company in the Altoona area, could testify that Mr. Lingenfelter had "the best possibility in the world to pull this thing out" defies rational comprehension. This opinion by Mr. Burdis contained no delineation of fact or reasons why he believed this. It was merely an empty assertion.

The words of Mr. Kline, witness for appellant and sometime stockholder in and financial agent to appellee, characterized appellee's business in an accurate albeit earthy manner:

"In my business, when we slaughter cattle we buy them as cheap as we can. Then we sell them. We've got to have a profit. Here there just wasn't any profit."

\* \* \*

"[A]ll these cars were going through without a profit and there was sure a lot of cars going through. I'd hate to sell all them cattle going through my slaughterhouse without a profit."

One more problem remains for discussion. That pertains to allegations in the complaint in which appellee charged:

"10. Plaintiff has demanded of defendant an accounting of its percentage of paid out accounts but defendant has refused and failed to account."

\* \* \*

"12. By reason of wilful and malicious acts of the defendant, plaintiff \* \* \* has failed to receive accounting from the defendant of money due and owed. \* \* \* "

Each time appellee sold a car and appellant financed the purchase, the appellee was entitled to 20 percent of the insurance premium and 10 percent of the interest charge collected by the appellant. Under an agreement called a special nonrecourse plan appellee agreed to the establishment by appellant of two reserve accounts designed to protect appellee from the responsibility for losses by reason of, among other things, default by the retail customer in carrying out the terms of his financial agreement with appellant. The plan generally provided

that all commissions due appellee should go into a special reserve fund until it reached $1500. Thereafter, out of appellee's share of the retail customers payments, $25.00 was to go into the special reserve fund and any excess went into a regular reserve fund from which it was agreed appellee would draw the accumulations monthly. There was also an agreement that accumulations in the reserve funds could be applied to the principal of the capital demand note at the option of the appellant.

Contingent charges against the reserve funds could not be known until the expiration of the financing arrangements between the retail customers and the appellant. Expirations often extended to a term of three years from the date of purchase.

It was undisputed that the records kept by appellant of the special and regular reserve accounts disclosed that the reserve funds were debited for reductions in the principal of the capital demand note and for various refunds and other charges.[41] Nor it is disputed that on the liquidation of all of the retail accounts the final accounting showed a balance due appellee in the sum of $107.94, for which it was paid by check on January 20, 1960, endorsed and used by Mr. Lingenfelter.

Appellee stressed the failure of the appellant to make monthly payments to it from accumulations in the regular reserve account. That appellant had in its possession reserves which appellee claimed were distributable to it on a monthly basis, appellee contends, emphasized the oppressive and harassing character of its actions in calling the balance due on the capital demand note of $10,000 on September 19, 1956.

Appellee offered no evidence to prove that it ever demanded any monthly remittance. Appellee's charge that the possession of the reserve fund should have inhibited the appellant from calling its demand note is without merit. The reserves, at their peak, represented one third or less than the balance due on the note. Indeed, some of the funds were used to reduce the principal of the note. After the termination of the relationship between the parties no new funds could flow into the accounts, hence they were susceptible of depletion until the final liquidation of the retail financing.

No proof was offered by appellee from which it could be determined that appellant owed it any proceeds from the reserve accounts. Under such circumstances no reasonable inference could be drawn that would entitle appellee to relief on this aspect of its complaint.

The trial in this case took place five years after the events which formed the basis of the complaint. Such a long lapse of time may be expected to play tricks with the memories of witnesses. In this case, however, analysis of the testimony reflects an inordinate number of inconsistent statements by witnesses, not only as against one another, but by the very same witnesses. This, together with the vagueness and uncertainty marking the testimony, impedes any attempt to describe events properly and ascertain exact dates correctly.

Although this court possesses the power "to review questions of law in the field of damages, appellate courts generally are reluctant to disturb juries' verdicts unless they offend fundamental conceptions of allowable damages."[42] The long settled rules promoting this reluctance are that, among other functions, the jury must determine the credibility of witnesses and the weight of their testimony. The members of the jury are "presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men; and so long as we have jury trials they should not be disturbed in their pos-

---

41. No purpose could be served to detail the many in and out items comprising the voluminous records.

42. Vaught v. Childs Company, 277 F.2d 516, 518 (2 Cir. 1960).

session of it, except in a case of manifest and extreme abuse of their function[s]."[43]

Moreover, the jury may use a "measure of speculation" in arriving at its decision.[44] And although the appellate court might draw a contrary inference or feel that another conclusion is more reasonable, the law precludes us from so doing. But it is another matter for the jury to indulge in sheer speculation or conjecture. This involves formation of a conclusion notwithstanding a complete absence of probative facts upon which to reason thereto. A verdict arrived at thereby and not on an evidentiary basis is reversible error.

Viewed in the light most favorable to appellee, the instant case fails to produce any evidence that could influence reasonable men to draw the legitimate inference necessary to compute the purported pecuniary loss of any prospective economic advantage to appellee, allegedly, proximately caused by appellant's inducing others to refuse to deal with appellee. There is no sure test for distinguishing between legitimate and illegitimate inferences.[45] To draw a legitimate inference, one must apply logic and common sense to the circumstances of a particular case in order to deduce a proposition as a logical consequence from other facts already proved. That a defendant acted in bad taste or even in an obnoxious manner, however, is an insufficient foundation upon which to infer pecuniary damages. Furthermore, it is settled that in Pennsylvania there may be no award of punitive damages where actual damage is not shown.[46]

The evidence failed to meet the standard whereby the jury could infer that pecuniary harm occurred to appellee. Accordingly, it should not have been burdened with the task of finding a verdict thereon. Rather, appellant U.C.I.T.'s motion for a verdict in its favor should have been directed by the Trial Court, or its motion for judgment notwithstanding the verdict should have been granted. Hence, the order of the United States District Court for the Western District of Pennsylvania, dated December 7, 1961, for judgment in favor of Bruce Lincoln-Mercury, Inc., and against Universal C.I.T. Credit Corporation, for actual damages of $50,000 and for punitive damages of $5,000, and its decision to deny motion for judgment notwithstanding the verdict or for new trial, will be reversed, with instructions to enter judgment in favor of appellant, Universal C. I.T. Credit Corporation in accordance herewith.

43. Ætna Life Insurance Co. v. Ward, 140 U.S. 76, 88, 11 S.Ct. 720, 724, 35 L.Ed. 371 (1891); cited with approval in Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 628, 64 S.Ct. 724, 88 L.Ed. 967, rehearing denied 322 U.S. 767, 64 S.Ct. 941, 88 L.Ed. 1593 (1944).

44. In Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916 (1946), the Supreme Court stated:
   "It is no answer to say that the jury's verdict involved speculation and conjecture. Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a *measure of speculation and conjecture* is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear." (Emphasis added.)

45. Wright on Federal Courts, Trials, § 95, p. 368 (1963).

46. Hilbert v. Roth, 395 Pa. 270, 149 A.2d 648 (1959).