In re O. P. M. LEASING SERVICES, INC., Debtor.

James P. HASSETT, as Chapter 11 Trustee of O. P. M. Leasing Services, Inc., Plaintiff,

v.

REVLON, INC., Defendant.

Bankruptcy No. 81 B 10533.
Adv. No. 82-5281A.

United States Bankruptcy Court,
S. D. New York.

Sept. 10, 1982.

---

Zalkin, Rodin & Goodman by Richard S. Toder, Menachem O. Zelmanovitz, Steven D. Tick, New York City, for James P. Hassett, as trustee of O. P. M. Leasing Services, Inc.

Paul, Weiss, Rifkind, Wharton & Garrison by Helen Davis Chaitman, New York City, for Revlon, Inc.

## DECISION ON REVLON, INC.'S MOTION FOR SUMMARY JUDGMENT AND ON THE O. P. M. TRUSTEE'S CROSS-MOTION FOR SUMMARY JUDGMENT

BURTON R. LIFLAND, Bankruptcy Judge.

This matter is before the Court on the Motion of Revlon, Inc. ("Revlon") for Summary Judgment pursuant to Bankruptcy Rule 756 [1] and Rule 56 of the Federal Rules of Civil Procedure to dismiss the claim of the trustee of O.P.M. Leasing Services, Inc. ("O.P.M.") ("the Trustee"). Revlon also seeks summary judgment on its counterclaims against the Trustee. The Trustee has crossmoved herein for summary judgment dismissing Revlon's counterclaims and for related relief.

### I. *Statement of Facts*

The instant adversary proceeding within this Chapter 11 case concerns two leases of computer equipment by means of Equipment Schedule Nos. 3 and 4 by O. P. M., the debtor herein, to defendant Revlon.

On March 11, 1981, O. P. M. filed a voluntary petition for reorganization in this Court under Chapter 11 of the Bankruptcy Code ("the Code"). On March 23, 1981, this Court ordered the appointment of a trustee, and on March 27, 1981, the Trustee was so appointed. O. P. M. is engaged in the busi-

---

1. The citation to Bankruptcy Rule 756 refers to one of the rules contained in the Rules of Bankruptcy Procedure promulgated by the Supreme Court pursuant to 28 U.S.C. § 2075 for use under the former Bankruptcy Act of 1898, as amended, and applicable under the Bankruptcy Code to the extent not inconsistent. *See* B.R.A. Sections 247, 402 and 405.

ness of buying, selling and leasing new and used computers and related equipment. On or about June 29, 1978, Revlon and O. P. M. entered into a Master Agreement of Lease ("the Master Lease") of certain computer equipment as set forth from time to time in Equipment Schedules ("the Schedules"). Pursuant to the Master Lease, each Schedule incorporates all the terms and conditions of the Master Lease unless a particular schedule declares otherwise. Pursuant to Master Lease Section 1, each Schedule constitutes a distinct and separate agreement of the parties to be construed under New York law.

Under the Master Lease, each Schedule is to be a net lease wherein, besides, the monthly rental payments, the lessee is obligated to preserve the physical condition of the leased equipment and to return the equipment at the expiration of the lease term in the same condition as when the lessee received it, less normal wear and tear. Also, lessee must pay or reimburse to lessor all applicable taxes and fees, maintain insurance on the leased equipment, and pay all maintenance expenses. Master Lease Section 6.1 also expressly provides that the relationship between O. P. M. and Revlon is that of lessor and lessee.

Obligations on the lessor's part pursuant to the Master Lease include: (1) its obligation pursuant to Section 8 to pay for the cost of returning the equipment at the expiration of the lease term; (2) its obligation pursuant to Section 14 to defend Revlon at its own expense against any action or claim against Revlon for infringement of any patent or copyright based on any of the equipment and to indemnify Revlon from any such claim; and (3) its obligation if any such patent or copyright claim is held to be an infringement either to procure for Revlon the right to continue using the equipment, to modify the equipment to render it noninfringing, or to replace it with equally suitable equipment at the same rental terms.

Moreover, both parties maintain additional obligations pursuant to Section 7.2 of the Master Lease. Under this Section, lessee is obligated to enter into and maintain in force a supplier's standard maintenance contract for the maintenance of the leased equipment. However, if an equipment schedule so provides, lessee's rental payments may include an estimated monthly maintenance charge. In such cases, the lessors are obligated to make monthly maintenance payments directly to the Maintenance Provider for maintenance services. Should the actual monthly maintenance charge exceed the estimate, lessee is obligated to reimburse lessor for the difference. Conversely, should the estimate exceed the actual monthly maintenance charge, lessor is to reimburse Lessee for the difference. Section 7.2 of the Master Lease further provides that in the event lessor fails to pay a monthly maintenance charge (and fails to cure within sixty days), lessee has the right of reimbursement and may exercise an option to extend the lease term at a rental of one dollar per month for an additional 96 months less the number of months comprising such lease term. ("the Dollar Option")

On December 15, 1978, O. P. M. and Revlon entered into Equipment Schedule No. 3 for a term of 37 months expiring January 31, 1982. The rental payments for months 14 through 37, the final 24 months, included an estimated monthly maintenance charge of $3,350. Today, according to the Trustee, the Schedule 3 equipment is worth approximately $100,000 and in 1986, when the Dollar Option expires, the equipment will be virtually worthless. *See* Affidavit of Michael R. Seekings in Support of Trustee's Motion ¶ 8. Revlon does not contradict that this equipment has substantial value today and that it will be virtually worthless at the expiration of the Dollar Option.

O. P. M. assigned its right to receive the final 35 monthly rental payments under Schedule 3 to the Philadelphia Savings Fund Society ("PSFS") and simultaneously granted PSFS a first security interest in the Equipment. PSFS did not assume O. P. M.'s numerous obligations under this Schedule, as detailed *supra*. All the assigned rentals have been paid to PSFS and PSFS no longer has any interest in either the equipment or in Schedule 3.

On April 23, 1979, O. P. M. and Revlon entered into Equipment Schedule 4 for a lease term of 64 months. The rental payments for months 13 through 64 on this unexpired lease include an estimated monthly maintenance charge of $8,320. Equipment Schedule 4 paragraph 5 also provides that a maintenance default by lessor under Schedule 3 will constitute a maintenance default by lessor under Equipment Schedule 4. However, there is no provision in the Master Lease or in Schedule 3 or 4 deeming a maintenance default under Schedule 4 as such a default under Schedule 3.

Moreover, Revlon was granted a very limited right to assign Schedules 3 and 4 under Section 5.2 of the Master Lease. Section 5.2 provides:

"5.2 *Assignment by Lessee.* Upon at least thirty (30) days prior written notice to Lessor and Lessor's assignee, Lessee may assign any Equipment Schedule to any party, provided that Lessor and Lessor's assignee approve in writing such assignment (which approval, in the case of the Lessor only, shall not be unreasonably withheld), in which event such assignment shall relieve Lessee of its obligations thereunder; or, if Lessor or Lessor's assignee does not approve such assignee, on the conditions that (i) Lessee remain primarily liable for the performance of all of the obligations of the lessee under such Equipment Schedule; and (ii) Lessee give Lessor and Lessor's assignee at least thirty (30) days prior written notice of such non-approved assignment."

Revlon never advised O. P. M. or the Trustee that it intended to assign Schedule 3 to any other entity.

By letter dated March 16, 1981, IBM ("the Maintenance Provider") advised Revlon that effective March 9, 1981, it had terminated the Maintenance Agreement covering the Schedule 3 and 4 equipment because of O. P. M.'s failure to pay monthly maintenance charges since November 1, 1980. The Trustee shortly after his appointment similarly failed to make such maintenance payments. Revlon then agreed to make monthly maintenance payments on the Schedule 3 and 4 equipment directly to I. B. M. In addition, Revlon made 24 monthly rental payments directly to O. P. M.'s assignee, PSFS, which payments included estimated maintenance charges.

Shortly after Revlon's direct assumption of the contract with the Maintenance Provider, Revlon purported to exercise its rights under the Dollar Option by complying with the conditions set forth in Master Lease Section 7.2 for its exercise. By letter dated March 27, 1981, Revlon notified O. P. M. of its maintenance default. O. P. M. failed to cure the default and by letter dated June 16, 1981, Revlon notified O. P. M. that it was exercising its rights under the Dollar Option with respect to Schedules 3. On or about December 23, 1981, Revlon sent a check for $60.00 to the Trustee as prepayment of the rentals for the ensuing 60 months under the Dollar Option. Revlon has refused to return the equipment to the Trustee and has not paid any other monies for it besides the $60.00 payment under the Dollar Option.

On February 19, 1982 the Trustee commenced this adversary proceeding seeking (i) the immediate turnover to him of the Schedule 3 equipment; (ii) the payment by Revlon to him of a reasonable rental for use of the Schedule 3 equipment for the period commencing January 31, 1982, the lease expiration date, until such equipment has been returned; and (iii) the recovery from Revlon of all damages and expenses incurred by the Trustee, including reasonable attorney's fees.

On March 22, 1982, Revlon served its Answer and Counterclaim generally denying the Trustee's right to the relief he seeks and seeking: (i) a declaration that it is entitled to continued possession of the equipment for the remaining 59 months at $1.00 per month; (ii) relief from the automatic stay in order to assign its lease of the equipment; (iii) a declaration that it has an equitable lien on the Schedule 3 and 4 equipment in an amount exceeding $140,-000; and (iv) a declaration that it has an

administrative claim and a lien on the equipment in an amount exceeding $140,000. Simultaneously, Revlon made the instant motion for summary judgment seeking a dismissal of the Trustee's complaint and granting judgment on the above-detailed counterclaims.

Thereafter, on April 16, 1982 the Trustee served his Reply, generally denying the relief sought by Revlon in its counterclaims, and asserting various affirmative defenses. The Trustee also cross moved for summary judgment,[1A] seeking judgment (1) dismissing Revlon's counterclaims; (2) requiring Revlon immediately to turn over possession to the Trustee of the equipment at issue; (3) adjudging Revlon liable to the Trustee for its continued possession of the equipment subsequent to the expiration of the lease with damages, expenses and attorney's fees; and (4) ordering the severance for trial of the determination of the amounts for which Revlon is liable to the Trustee.

## II. *Issues Presented*

The issues presented by both parties' motions for summary judgment are:

(1) Whether the Dollar Option is enforceable as a proper liquidated damages clause or unenforceable because it is an unconscionable penalty;

(2) Whether Revlon has a perfected security interest in the Schedule 3 and 4 Equipment;

(3) Whether the Trustee may reject the lease if it has been validly extended under the Dollar Option by Revlon;

(4) Whether Revlon is entitled to an equitable lien on the Schedule 3 and 4 equipment;

(5) Whether Revlon is entitled to an administrative claim for the maintenance pay-

ments it made directly to the Maintenance Provider;

(6) Whether Revlon may assign the Schedule 3 equipment; and

(7) Whether Revlon is liable for the reasonable rental value of the Schedule 3 Equipment from the date the lease terminated until its turnover to the Trustee.

## III. *Discussion of Law*

### A. *The Dollar Option*[2]

■ Revlon contends that it may exercise and enforce the Dollar Option against the Trustee based upon O. P. M.'s Maintenance Default under Schedule 3. For the reasons set forth in detail below, this Court holds that the Dollar Option is an unenforceable penalty.

Pursuant to Section 7.2 of the Master Lease, O. P. M. was obligated to make monthly maintenance payments to the Maintenance Provider during the Schedule 3 lease term. O. P. M. ceased making such payments several months prior to the filing of its petition. After the petition was filed, the Trustee similarly determined that it was not in the best interests of the O. P. M. estate to continue such payments.

The lease term under Schedule 3 expired on January 31, 1982. However, Revlon has not returned the equipment to the Trustee, maintaining that it has validly exercised the Dollar Option and has the right to retain the equipment for an additional 59 months at a rental of $1.00 per month. Revlon argues that it has that right to exercise the Dollar Option in addition to its right to seek reimbursement from O. P. M. for any monthly maintenance charges paid by Revlon.

■ It is well-established that a bankruptcy court, being essentially a court of

---

**1A.** In the Statements submitted by Revlon and O. P. M. pursuant to Local Rule 3(g), both parties agreed that there were no triable issues of fact and that their respective liabilities were thus ripe for determination as a matter of law.

**2.** In interpreting a contractual provision fixing damages, a court should not elevate form over

substance. Therefore, it is immaterial to this court's analysis that the parties did not label the provision in question a liquidated damages clause. *See Truck Rent-A-Center v. Puritan Farms 2nd, Inc.,* 41 N.Y.2d 420, 425, 361 N.E.2d 1015, 1018, 393 N.Y.S.2d 365, 369 (1977).

equity, *see, e.g., Pepper v. Litton,* 308 U.S. 295, 304, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939), will not enforce a liquidated damages clause that is in reality a penalty. *See In re Tastyeast, Inc.,* 126 F.2d 879, 881 (3rd Cir.), *cert. denied,* 316 U.S. 696, 62 S.Ct. 1291, 86 L.Ed. 1766 (1942); *In re Oahu Cabinets, Ltd.,* 12 B.R. 160, 165, 7 B.C.D. 402, 405, 4 CBC 2d 441, 447 (Bkrtcy.D.Hawaii 1981). Whether a contractual provision purporting to grant liquidated damages is in fact an unenforceable penalty is to be determined under applicable state law. *In re United Merchants and Manufacturers, Inc.,* 674 F.2d 134, 141 (2d Cir. 1982); *In re Tastyeast, Inc.,* 126 F.2d at 881–82; *Lange v. Farmers Federation Cooperative, Inc.,* 249 F.Supp. 544, 546 (W.D.N.C.1966); *In re Holiday Mart, Inc.,* 9 B.R. 99, 107 (Bkrtcy.D. Hawaii 1981).

New York law governs the instant transaction. Section 19.5 of the Master Lease provides that the Master Lease and each Schedule "shall be governed and construed for all purposes under and in accordance with the laws of New York." It is settled law that the parties' bona fide choice of law in a contract will be honored where the chosen state has some relation to the agreement. *See Siegelman v. Cunard White Star,* 221 F.2d 189, 195 (2d Cir. 1955); *Depositors Trust Co. v. Hudson General Corp.,* 485 F.Supp. 1355, 1359 (E.D.N.Y. 1980). New York is the bona fide choice of law of the parties and has a substantial relation to the agreement because it is the principal place of business of both Revlon and O. P. M.

Under New York law, a liquidated damages clause is valid if: (1) actual damages are difficult to determine, that is, not "readily ascertainable", *and* (2) the sum is a reasonable estimation of potential damages, i.e., not "plainly disproportionate" to the

possible loss. *United Merchants, supra* at 142; *Accord, Leasing Services Corp. v. Justice,* 673 F.2d 70, 73 (2d Cir. 1982); *Walter E. Heller & Co. v. American Flyer Airlines Corp.,* 459 F.2d 896, 899 (2d Cir. 1972); *Brecker v. Laiken,* 430 F.Supp. 103, 106 (S.D.N.Y.1977). If such a contractual provision cannot meet *both* of these two requirements, it is deemed a "penalty" and will not be enforced. *Id. See also Truck Rent-a-Center, Inc. v. Puritan Farms 2nd, Inc.,* 41 N.Y.2d 420, 425, 361 N.E.2d 1015, 1018, 393 N.Y.S.2d 365, 369 (1977).

As the Second Circuit stated in *Leasing Services,* the rationale for these requirements is that "contractual terms fixing damages in an amount clearly disproportionate to actual loss seek to deter breach through compulsion and have an *in terrorem* effect: fearing severe economic loss, the promisor is compelled to continue performance, while the promisee may reap a windfall well in excess of his just compensation." *Leasing Services,* 673 F.2d at 73 (citation omitted). Thus, courts striking down such penal clauses have sought to avoid this unjust result.

In the instant case, the Dollar Option fails to satisfy either prong of this test and thus must be viewed as an impermissible penalty. The possible damages flowing from a default by O. P. M. of its maintenance obligation were readily ascertainable at the time the parties entered into the agreement at issue.[3] This is because it was readily ascertainable by the parties at the time the lease was executed that in the event of O. P. M.'s failure to make maintenance payments, Revlon would have to make the payments itself directly to the maintenance supplier, even if duplicative, and then seek reimbursement from O. P. M. of the difference between the charges it actually paid and the charges it contracted to pay.[4]

---

**3.** The court must determine the validity of a liquidated damages clause as of the time the parties entered into the agreement at issue. Hindsight may *not* be used in accomplishing this analysis. *See United Merchants and Manufacturers,* 674 F.2d at 134; *Truck Rent-A-Center v. Puritan Farms 2nd, Inc.,* 41 N.Y.2d 420,

361 N.E.2d 1015, 393 N.Y.S.2d 365 (1977); *Seidlitz v. Auerbach,* 230 N.Y. 167, 172, 129 N.E. 461, 462 (1920).

**4.** Similarly, in *City of New York v. Brooklyn and Manhattan Ferry Company,* 238 N.Y. 52, 143 N.E. 788 (1924), the court found that actual

The amount of such actual damages was also capable of easy estimation at the time the lease was executed as the parties themselves did estimate the maintenance payments to be $3,350 in drafting Schedule 3. To calculate damages based upon O. P. M.'s default in making one of these payments, all that was required was to multiply that sum by the number of months missed.[5] Thus, both the method of keeping the equipment maintained and the amount of monthly maintenance payments in the event of O. P. M.'s default were readily ascertainable by the parties at the time the lease was executed.

■ The Dollar Option also fails the second prong of the test. This clause was not a reasonable estimation of actual damages at the time it was executed as, by its terms, it is in force in addition to Revlon's right to recover actual damages. See Master Lease § 7.2. Such a cumulation of remedies for Revlon renders the Dollar Option void as a penalty. See, e.g., New York Dock Company v. City of New York, 246 A.D. 620, 283 N.Y.S. 2 (2d Dep't 1935); Jarro Building Industries Corp. v. Schwartz, 54 Misc.2d 13, 281 N.Y.S.2d 420 (N.Y.App. Term 1967); Frankel's Carpet Fashions, Inc. v. Abraham, 228 N.Y.S.2d 123, 126 (Sup.Ct. Nassau County 1962); Downtown Harvard Lunch Club v. Racso, Inc., 201 Misc. 1087, 1091, 107 N.Y.S.2d 918, 923 (Sup.Ct. New York County 1951).

In Jarro, supra, the court held a contract provision giving both liquidated and actual damages void as a penalty. In so doing, the court stated: "If appellant here could recover both liquidated and actual damages, there would be no question that the liquidated damages provision was a penalty." Jarro 54 Misc.2d at 422, 281 N.Y.S.2d 420.

The Dollar Option purports to give Revlon the right to extend Schedule 3 for 59 months in the event O. P. M. fails to pay any · "maintenance charge" estimated at $3,350 per month. Thus, for one missed monthly payment, Revlon would have virtually free use of a machine which both parties have conceded has substantial value and which the Trustee has estimated as worth $100,000 for almost five years, the remainder of the equipment's useful life.[6] This is plainly disproportionate to any po-

---

5. For other cases holding that actual damages were readily ascertainable where the measure of actual damages was a multiple of a fixed amount pursuant to a contract, see Gilad Realty Corp. v. Ripley Pitkin Ave., Inc., 48 A.D.2d 683, 368 N.Y.S.2d 228 (2d Dep't 1975); Edelstein v. Spielberger, 197 A.D. 262, 188 N.Y.S. 723 (1st Dep't 1921).

6. In Gilad Realty Corp. v. Ripley Pitkin Ave., Inc., 48 A.D.2d 683, 368 N.Y.S.2d 228 (2d Dep't 1975), the court invalidated a liquidated damages clause similar to the one at issue herein as clearly disproportionate to the potential for actual damages. Gilad involved a provision in a real property lease which purported to obligate the tenant to pay an additional monthly charge for 225 past and six future months because he had defaulted in paying rent with but six months remaining on the original 21-year lease term. The court held this clause to be an unenforceable penalty because not only was the potential amount of damages clearly ascertainable when the lease was executed, but also because this amount was clearly disproportionate to the actual damages. Such is also the case herein where the missing of but one payment by O. P. M. would trigger a windfall for Revlon.

---

damages were readily ascertainable at the time the lease was executed under facts quite similar to the case at bar. In B & M Ferry Company, the lessee of a ferry franchise from the City of New York was required to deposit securities with the City to guarantee the performance of the conditions of the lease. The City sought to retain these securities upon breach of the lease arguing that they constituted a proper liquidated damages clause. The court held this provision an unenforceable penalty and stated that the damages flowing from breach of the contract to operate the ferry service were capable of accurate valuation. This is because at the time the lease was executed, the City knew that it could continue operation of the ferry and recover the difference between the contract consideration and the actual cost of the operation. Id. at 56, 143 N.E.2d at 789.

In like fashion, in the instant case, both parties were aware that upon default by O. P. M. of its maintenance obligation, Revlon would have to make the payments itself directly to the supplier. Revlon would then be entitled to recover the difference between the maintenance charges it actually paid and the maintenance charges it contracted to pay. Accordingly, the damages upon O. P. M.'s default were readily ascertainable by O. P. M. and Revlon at the time the lease was executed.

tential loss, especially in view of its cumulation with Revlon's right to recover actual damages, and demonstrates the penal nature of the Dollar Option.

Courts have generally held a liquidated damage clause to be penal if any doubt exists as to its propriety and fairness under the above-described tests. *See, e.g., City of New York v. Brooklyn and Manhattan Ferry Co.,* 238 N.Y. 52, 56, 143 N.E. 788, 790; *Jarro Building Industries Corp. v. Schwartz,* 54 Misc.2d 13, 281 N.Y.S.2d 420.

In support of its position that the Dollar Option is a permissible liquidated damages clause, Revlon relies extensively on two recent Second Circuit decisions which upheld liquidated damage clauses, *United Merchants, supra,* and *Leasing Services, supra.* These cases, however, are clearly inapposite. Revlon's reliance on these cases is misplaced because the clauses in these cases satisfied the two-pronged test. The Dollar Option, however, fails to satisfy either prong.

In *United Merchants,* two loans in the total amount of $45,000,000 were made by two lenders to United Merchants. Two years after the second loan, United Merchants filed a Chapter XI petition. The lenders filed proofs of claim for the outstanding principal and prepetition interest and expenses, in addition to collection costs and liquidated damages. At issue before the Second Circuit, *inter alia,* was the validity of the liquidated damages clause. The liquidated damages provision in the loan agreement provided that upon default:

> then, at the option of the holder of any Note, exercised by written notice to [UM&M], the principal of such Note shall forthwith become due and payable, together with the interest accured thereon, *and, to the extent permitted by law, an amount equal to the pre-payment charge that would be payable if [UM&M] were pre-paying such Note at the time pursuant to ¶ 8.2 hereon.*

*United Merchants,* 674 F.2d at 140.

The Second Circuit in *United Merchants* in upholding this provision relied extensively on its earlier decision, *Walter E. Heller &*

*Co. v. American Flyers Airlines Corp.,* 459 F.2d 896 (2d Cir. 1972). In *Heller,* a lender sought liquidated damages of approximately $250,000 for breach of a loan agreement for $9,000,000. Liquidated damages in *Heller* were payable *only* if the parties failed to consummate the loan agreement through no fault of the lender. The court in *Heller* found the damage provision enforceable as at the time contract was executed, it was not plainly disproportionate to the potential loss to the lender upon default of the borrower in light of the following factors:

1. Upon default, the Lender was faced with the loss of some or all of the interest to which it was entitled under the contract;

2. The lender limited its lending activities so the funds would be available when needed by the borrower;

3. The lender was faced with the cost and expense of procuring a substitute borrower should the borrower renege;

4. The sum arrived at was the product of an arms-length transaction between sophisticated businessmen ably represented by counsel.

The court in *United Merchants* thus upheld the liquidated damages clause before it because virtually all the above-described factors relied on in *Heller* to uphold the clause in *Heller* were also present in *United Merchants.*

Revlon contends that these factors are also present here and that *Heller* and *United Merchants* are direct authority for its position herein. However, *Heller* and *United Merchants* involved complex, sophisticated loan arrangements unlike the instant business transaction. Revlon makes the unsubstantiated assertion that it, like the lender in *Heller,* limited its business activities so as to keep certain funds available to cover maintenance expenses should O. P. M. default on its maintenance obligations. Such assertion, in conclusory terms by Revlon without further detail as to potential loss of business, is unconvincing because the same can be stated conclusorily by anyone seeking to enforce a liquidated damages clause.

Revlon also contends, like the lender in *Heller,* that it was faced with uncertain cost and expense in procuring substitute maintenance service should O. P. M. default in its maintenance obligation. Revlon argues that, in turn, this uncertainty as to cost and expense could have resulted in harm to Revlon's business. Again, Revlon has offered no documentation as to potential harm to its business due to this uncertainty. In addition, this court finds the analogy to *Heller* also inapposite because pursuant to Section 7.2 of the Master Lease, it is Revlon who is the party entering into the standard maintenance contract with the maintenance supplier. Plain business sense dictates that the supplier know both the location of the equipment and the current user thereof and contact the user before such service is terminated. In fact, Revlon has admitted that this is what actually occurred. *See* Affidavit of Edward W. Karn, in support of Revlon's Motion for Summary Judgment, sworn to on March 23, 1982, ("Karn Affidavit") ¶¶ 12 and 13 and Exhibit D annexed thereto. Accordingly, Revlon has failed to demonstrate any uncertainty as to cost and expense in procuring substitute maintenance service.

Moreover, both *United Merchants* and *Heller* are further distinguishable as in those cases, the liquidated damages provisions were closely related to the damages for which they were designed to compensate. In *Heller,* the liquidated damages amount was not in addition to but in lieu of actual damages. It was to be paid only where the loan was not consummated through no fault of the lender, and was a reasonable estimation of the lender's loss of interest and attendant costs upon such an event. Had the loan been made, the lender would have been entitled to actual damages under the law but not the liquidated damages amount.

In *United Merchants,* the liquidated damages provision was tailored closely to the potential loss. The prepayment charges there were designed to recoup for the lender the specific interest lost by the lender that would have been payable over the full term of the loan. Thus, the later the pre-payment upon default occurred, the less interest would be lost and the smaller the amount of such prepayment charge or liquidated damages. In contrast, in the case at bar, only one missed maintenance payment by O. P. M. would enable Revlon to continue to use the equipment virtually rent-free for the entire useful life of the equipment. Thus, unlike the exercise of the damages clause in *United Merchants,* Revlon's exercise of the Dollar Option would be totally unrelated to and unaffected by the timing and amount of the maintenance default and would reap a windfall on Revlon while causing O. P. M. to suffer a penalty.

In *Leasing Services, supra,* plaintiff, assignee of an equipment lessor, sought to hold defendants, guarantors of the lessee's obligations, liable for the lessee's defaults under certain equipment leasing arrangements. The Second Circuit described the liquidated damages clause in *Leasing Services* as follows:

If the lessee failed to pay rent, the lessor had the right to accelerate the balance due, declaring that the entire amount of the unpaid rent was due and owing. In that event, the lessor, according to the lease terms, had the right to (1) recover the balance due; *or* (2) take possession of the equipment, and (a) retain the equipment and all prior payments of rent, or (b) retain all prior payments and sell the equipment at a public or private sale, applying any proceeds, less fifteen percent of the Total Rent required by the lease and expenses incurred in connection with the sale, to the amount owed by the lessee.

*Id.* at 72. (emphasis added)

Revlon is correct in stating that the damages clause in *Leasing Services* was upheld, but fails to note that that clause, unlike the instant clause, does not allow an unfair cumulation of remedies. The *Second Circuit* in *Leasing Services* found that the lessor was entitled to retain fifteen percent of the total rent because this amount represented "a reasonable estimation of the residual value of the equipment," which resid-

ual value would be lost to the plaintiff upon sale. *Id.* at 74. The court noted that defendants in *Leasing Services* had failed to describe any facts to support their argument that the fifteen percent figure was not reasonably related to the equipment's residual value. *Id.*

Moreover, by its terms, the damages clause in *Leasing Services* did not entitle the plaintiff to recover *both* liquidated and actual damages. The maximum recovery in *Leasing Services* for the lessor was the unpaid rentals on the equipment. Plaintiff thus could not recover the balance due it plus this additional fifteen percent.

In contrast, under Section 7.2 of the Master Lease, Revlon purports to assert the right to exercise the Dollar Option in addition to recovering all damages. Furthermore, O. P. M., unlike the guarantors in *Leasing Services,* has amply demonstrated that the damages clause herein is disproportionate to the amount of actual damages which should have been anticipated at the time the lease was executed. Also, O. P. M. has demonstrated that unlike the residual value of equipment, which value is subject to the vagaries of the marketplace, the value of the maintenance payments were reasonably ascertainable at the time the lease was executed.

█ Indeed, the Dollar Option with its above-described penalty features is in sharp contrast to that which could have been drafted in order to compensate Revlon in an amount proportionate to its actual loss.

Such a provision could have simply provided for Revlon's continued use of the equipment for as many months as necessary to compensate it for its actual loss with the value of such use to be measured by the fair rental value of the equipment. In fact, the method for determining such fair rental value had already been agreed upon by the parties in connection with Revlon's renewal option under the lease. *See* Section 2.2 of the Master Lease.[7]

Accordingly, the Dollar Option is a penalty provision and is unenforceable as a matter of law.

## II. *Revlon's Purported Security Interest*

Revlon contends that the Dollar Option gives it a perfected possessory security interest in the Schedule 3 equipment under Article 9 of the Uniform Commercial Code ("UCC"). It asserts that Section 7.2 of the Master Lease conveys to it an interest in the Schedule 3 equipment securing O. P. M.'s performance of its maintenance obligations and that this equipment itself is the collateral subject to the security interest. Revlon further argues that its security interest was perfected when it took possession of the equipment pursuant to the lease. For the reasons hereinafter detailed, this Court finds that Revlon possesses no security interest, perfected or otherwise, in any equipment.

█ Article 9 applies only to a transaction which is intended to create a security interest in personal property. The principal

---

7. Revlon further asserts that the Dollar Option is enforceable because it was recognized by the parties during contract negotiations that this Option was necessary to the lease in order to protect Revlon in the event of O. P. M.'s financial difficulty (*See* Revlon Reply brief, at 6–7). This contention is without merit because such allegations as to the facts surrounding the transaction at issue are both totally without the scope of the record and barred by the parol evidence rule. *See Farmer v. Arabian American Oil Co.,* 277 F.2d 46, 49 (2d Cir.), *cert. denied,* 364 U.S. 824, 81 S.Ct. 60, 5 L.Ed.2d 538 (1960) where the Second Circuit expressed the rule as:

When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and ac-

curate interpretation of that contract, evidence, whether parol or otherwise of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing.

*Accord, Leslie Fay, Inc., v. Rich,* 478 F.Supp. 1109, 1113 (S.D.N.Y.1979).

In addition, that O. P. M. did eventually file a petition in bankruptcy is no justification for the inclusion of the Dollar Option. This is because the Second Circuit has clearly enunciated that the soundness of a damages clause must be tested in light of the circumstances at the time the contract was executed rather than at the time the damages became payable. *See United Merchants, supra* at 142, *Heller,* 459 F.2d at 898.

test for determining whether a transaction creates a security interest is whether the transaction was intended to have that effect. N.Y. UCC § 9–102 Official Comment No. 1 (McKinney 1964); *In re Miller,* 545 F.2d 916 (5th Cir.), *cert. denied,* 430 U.S. 987, 97 S.Ct. 1687, 52 L.Ed.2d 382 (1977); *Bruce Lincoln-Mercury, Inc. v. Universal C. I. T. Credit Corp.,* 325 F.2d 2, 19 (3d Cir. 1963); *Foley Machinery Co. v. John T. Brady Co.,* 62 Misc.2d 777, 310 N.Y.S.2d 49 (Sup.Ct., Queens County 1970). In an unambiguous contract, the intention of the parties to create a security interest is to be gleaned from the contract itself. *See, e.g., Percival Construction Co. v. Miller & Miller Auctioneers, Inc.,* 532 F.2d 166 (10th Cir. 1976); *Citicorp Leasing, Inc. v. Allied Institutional Distributors, Inc.,* 454 F.Supp. 511 (W.D.Okl.1977).

█ In the case at bar, the Master Lease unambiguously and unequivocally contradicts Revlon's argument. Indeed, Section 5.1 of the Master Lease provides:

Nothing contained in any Equipment Schedule shall give or convey to Lessee any right, title or interest in or to the Equipment, except as lessee as set forth therein.

In like fashion, Master Lease Section 6.1 provides that the relationship between O. P. M. and itself "shall always be only that of Lessor and Lessee". Furthermore, in Master Lease Section 5.3(i), Revlon agreed that O. P. M. could grant a security interest in the Equipment without notice to Revlon.

Thus, from the clear wording of the Master Lease it is evident that no security interest was ever intended.[8] Indeed, even if we were to consider evidence of intent outside the four corners of the Master Lease, Revlon has submitted no facts in its affidavits in support of summary judgment evidencing Revlon's purported intent to create a security interest.[9]

Moreover, the Dollar Option does not fit within the definition of security interest contained in N.Y.U.C.C. § 1–201(37). Under this provision, a security interest is "an interest in personal property . . . which secures payment or performance of an obligation" N.Y.U.C.C. § 1–201(37) (McKinney Supp. 1981–82). Master Lease Section 7.2 does not provide recourse to property to secure an indebtedness. Rather, it provides an additional contract right in the event of a default by O. P. M. on its maintenance obligation. *See Dow and Company v. Lenstyle Construction Corp.,* 36 A.D.2d 681, 319 N.Y.S.2d 646 (4th Dept. 1971).

In addition, that Revlon had to pay an admittedly *de minimis* rental to exercise the Dollar Option also contradicts Revlon's assertion of a security interest. It is obvious that where property is intended as security for an obligation, the obligee does not pay the obligor rent on it.

█ Even if we were to assume that a security interest was intended, Revlon has offered no proof that a financing statement was filed and thus, its lien was not perfected. Such an unperfected lien is invalid as against the trustee in his capacity as a hypothetical lien creditor. *See* 11 U.S.C. § 544(a)(1) (Supp. IV 1980); N.Y.U.C.C. § 9–301(1) and (3) (McKinney Supp. 1981–82). Revlon attempts to avoid this filing requirement by contending that in this case, Revlon's possession of the equipment perfected its security interest in the equipment.

█ Possession of collateral is sometimes a proper alternate method of perfecting a security interest. Generally, security interests are perfected by the filing of financing statements. *See* N.Y.U.C.C. §§ 9–302 and 9–305 (McKinney Supp.1982). Pos-

---

**8.** It would have been a simple matter for the parties expressly to provide in the lease for the grant of a security interest. The court in *In re Nottingham,* 6 U.C.C.Rep. 1197, 1199 (Bankr.E. D.Tenn.1969), articulated this principle, stating:

The requirements of the Code for creating a security interest are simple—an intention to create a security interest is all that need be

shown—a dozen words or less are sufficient, but the security agreement must contain language that meets this simple requirement. *Accord, Mitchell v. Shepherd Mall State Bank,* 458 F.2d 700, 703 (10th Cir. 1972).

**9.** *See* note 18 *infra.*

session operates as a valid method of perfection in those situations where, like a financing statement, it gives notice to third parties that the property at issue is encumbered. *See Allegaert v. Chemical Bank,* 657 F.2d 495, 506 (2d Cir. 1980); J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code,* 934–35 (2d Ed. 1980). Such notice is required in order to prevent secret liens. *See United States v. Speers,* 382 U.S. 266, 275, 86 S.Ct. 411, 416, 15 L.Ed.2d 314 (1965).

In the instant case, to validate a security interest on the part of Revlon would indeed trigger the operation of a secret lien. Third parties would in no way be put on notice of Revlon's security interest in the equipment by Revlon's possession of it since Revlon already has possession of it as a lessee. Therefore, this Court finds that a financing statement would have had to have been filed for this interest to have been perfected. Since no financing statement was filed before the petition in bankruptcy was filed, such a purported lien would be void as against the Trustee.

Accordingly, Revlon does not hold a valid security interest in the equipment at issue.

III. *The Trustee's Rejection of the Lease*

Even were the lease term of Schedule 3 to be extended by Revlon's exercise of the Dollar Option, such unexpired lease has been rejected by the Trustee pursuant to Section 365(a) of the Code. Revlon argues that this lease is not an executory contract or unexpired lease. This contention is clearly erroneous.

■ Subject to the court's approval, a trustee may reject any executory contract or unexpired lease of the debtor. 11 U.S.C. § 365(a) (Supp. IV 1980). Section 70(b) of the predecessor Act, the correlative provision to Section 365 of the Code, did not expressly include "unexpired leases" of personalty within the purview of those executory contracts which may be rejected by a trustee. However, unexpired leases have been expressly included within Section 365 of the Code to preclude any uncertainty as to whether an unexpired lease is an execu-

tory contract which is subject to rejection or assumption by a trustee within the exercise of his business judgment. 2 *Collier on Bankruptcy* ¶ 365.02 at 365–12, 365–13 (15th ed. 1982); P. Murphy, *Creditors Rights in Bankruptcy* § 9–01 at 9–2 n.1 (1981).

■ Although there is no statutory definition of an executory contract, the legislative history of Section 365 of the Code makes it clear that it "generally includes contracts on which performance remains due to some extent on both sides." H.R. Rep.No. 595, 95th Cong., 1st Sess. 347 (1977); S.Rep.No.989, 95th Cong., 2nd Sess. 58 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5844, 6303. *Accord, Jenson v. Continental Financial Corp.,* 591 F.2d 477, 481 (8th Cir. 1979) (a contract is executory where obligations of the debtor and the other contracting party remain partially and materially unperformed); *In re Knutson,* 563 F.2d 916, 917 (8th Cir. 1977) (a contract is executory where both sides have substantial obligations to perform); *In re American Magnesium Co.,* 488 F.2d 147, 152 (5th Cir. 1974) (a contract is executory where both parties have ongoing commitments). *See also In re Monsour Medical Center,* 8 B.R. 606, 612–613 (Bkrtcy.W.D.Pa. 1981); *In re Rovine Corp.,* 5 B.R. 402, 404 (Bkrtcy.W.D.Tenn.1980).

The equipment leases here are clearly executory as both Revlon and O. P. M. have many substantial remaining obligations to perform pursuant to the Master Lease. For example, the Trustee is obligated: (1) to reimburse Revlon for the monthly maintenance charges paid by Revlon during the term of the original lease (Master Lease § 7.2); (2) to pay all transportation charges in connection with the eventual return of the equipment (Master Lease § 8); (3) to defend and indemnify Revlon against patent or copyright infringement claims (Master Lease § 14); and (4) to warrant Revlon's quiet enjoyment of the equipment (Master Lease § 4.2).

On the other hand, Revlon's continuing obligations include: (1) payment of all taxes and fees (Master Lease § 6.2); (2) main-

tenance of insurance on the equipment (Master Lease § 6.3); (3) maintenance of the equipment in good operating order (Master Lease § 7.1); (4) the return of the equipment at the end of the lease term (Master Lease § 8); (5) assumption of the entire risk of loss and liabilities for injuries to persons or damage to property (Master Lease § 10.1); and (6) defense of the O. P. M. estate and indemnification of the estate against anyone claiming against or through Revlon (Master Lease §§ 5.1 and 10.2). These continuing obligations on both sides compel the conclusion that the Master Lease between the parties is executory and therefore wholly capable of rejection by the trustee.

■■■ The Trustee's right of rejection of the Master Lease as incorporated within Schedule 3 is conditioned on the court's approval. *See* 11 U.S.C. § 365 (Supp. IV 1980). However, the Code does not contain any explicit standards for review by the court of a trustee's decision to reject. Under the predecessor Act, many bankruptcy courts applied a "business judgment" test in determining whether executory contracts were properly rejected by the trustee. *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul and Pacific Railroad Co.*, 318 U.S. 523, 550, 63 S.Ct. 727, 742, 87 L.Ed. 959 (1943); *In re Minges*, 602 F.2d 38, 42–43 (2d Cir. 1979). Under the current Bankruptcy Code, the business judgment test is indeed the prevailing one.[10] *See, e.g., In re International Coins & Currency, Inc.*, 18 B.R. 335, 6 C.B.C.2d 309 (Bkrtcy.D. Vt.1982); *In re Lafayette Radio Electronics Corp.*, 8 B.R. 528 (Bkrtcy.E.D.N.Y.1981); *In* 

*re J. H. Land & Cattle Company, Inc.*, 8 B.R. 237 (Bkrtcy.W.D.Okl.1981); *In re Marina Enterprises, Inc.*, 14 B.R. 327 (Bkrtcy.S.D.Fla.1981). *See also* 2 *Collier on Bankruptcy* § 365.03 at 365–18 (15th Ed. 1982).

Under the "business judgment" test, a trustee or debtor in possession needs merely to demonstrate that the rejection of the executory contract will benefit the estate. *In re Minges*, 602 F.2d at 43; *In re Lafayette Radio*, 8 B.R. at 533. Courts have favored the business judgment approach because it places responsibility for estate administration on the trustee, thereby furthering the Code's policy of fostering the independence of the judicial branch of government. *See, e.g., In re Summit Land Co.*, 13 B.R. 310, 315 (Bkrtcy.D. Utah 1981). This, in turn, expedites estate administration and encourages rehabilitation by permitting the replacement of marginal with profitable business arrangements. *Id.*

Rejection of this lease will clearly benefit the estate as it will enable the Trustee to rerent the equipment at a reasonable rate, one far exceeding the *de minimis* consideration contemplated by the Dollar Option. This rejection would alleviate the drain on the estate caused by this lease which is of no benefit and burdens the estate with the numerous obligations to Revlon described above.

■■■ Accordingly, this Court affirms the rejection of Schedule 3 by the Trustee herein.[11]

## IV. Revlon's Purported Equitable Lien

■■■ Revlon claims in the alternative that it is entitled to an equitable lien on the

---

**10.** Revlon contends that the proper standard to be applied in reviewing the Trustee's rejection is whether the unexpired lease is burdensome to the debtor. However, this standard has generally not been applied by the more recent cases and has been criticized by commentators. *See, e.g.,* Code cases cited in text *supra*; P. Murphy, *Creditors Rights in Bankruptcy* at § 9.03, where *American Brake Shoe & Foundry Co. v. New York Railways*, 278 F. 842 (S.D.N.Y.1922), an earlier case espousing the burdensomeness test, is described as doubtful authority in light of the subsequent Supreme Court decision in *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific R.R.*,

518 U.S. at 550, 63 S.Ct. at 742. Even under this burdensomeness standard, this Court would permit the Trustee to reject the lease since the O. P. M. estate is receiving no benefit from it while being burdened with the above-described numerous obligations under it.

**11.** Revlon's argument that pursuant to Code Section 365(h), it may remain in possession of the leased equipment although the Trustee has rejected this lease is specious. Section 365(h) is by its terms limited to leases of real property. *See* 11 U.S.C. § 365(h) (Supp. IV 1980). *See also In re J. H. Land & Cattle Co., supra.*

Schedule 3 and 4 equipment [12] in the amount Revlon paid directly to I.B.M. for the maintenance of the equipment. In so doing, Revlon apparently bases its argument on the equitable principles governing the exercise of bankruptcy jurisdiction and its contention that its monthly maintenance payments preserved the equipment and thus benefitted the estate. This Court finds no equitable lien was created herein.[13]

An equitable lien will arise where "[a]n intention to create such a charge clearly appear[s] from the language and the attendant circumstances." *Cherno v. Dutch American Mercantile Corp.*, 353 F.2d 147, 153 (2d Cir. 1965) (quoting *Pennsylvania Oil Products Refining Co., v. Willrock Producing Co.*, 267 N.Y. 427, 434–35, 196 N.E. 385, 387–88 (1935)). *Accord, United States v. Mill Association Inc.*, 480 F.Supp. 3, 10 (E.D. N.Y.1978). Strict proof of such intention is required. *Cherno, supra* (quoting *Pennsylvania Oil Products Refining Co., v. Willrock Producing Co., supra*).

The doctrine is further limited to situations where a secured creditor is prevented from perfecting its interest by an uncooperative debtor. *See In re Trim-Lean Meat Products, Inc.*, 10 B.R. 333, 335 (D.Del. 1981). *See also Cherno, supra.* Therefore,

an equitable lien will not be upheld as against a trustee where all available means of perfecting a legal lien were not employed by the would-be secured creditor. *Miller v. Wells Fargo Bank International Corp.*, 406 F.Supp. 452, 484 (S.D.N.Y.1975), *aff'd*, 540 F.2d 548 (2d Cir. 1976).

Master Lease Section 7.2 does not in any way express an intention to create an equitable lien as it contains no language creating a lien. In fact, the lease expressly states that Revlon's interest in the equipment was nothing more than that of a lessee. *See* discussion regarding intent to create a lien, *supra* at 115–116.

Furthermore, Revlon has not taken any of the necessary steps to obtain a legal lien. There has been no proof offered by Revlon indicating any attempts to file a financing statement or any other type of public notice that it was holding the equipment as anything but a lessee. Without such public notice, Revlon would have a secret lien in the equipment, which is contrary to the policy of the Uniform Commercial Code and the Bankruptcy Code. *See United States v. Speers, supra.*

Moreover, in any event, even if an equitable lien were created, it would never-

12. Schedule 4 provides that a default by O. P. M. of its Schedule 3 maintenance obligation shall constitute a default of O. P. M.'s maintenance obligation under Schedule 4. *See* Schedule 4, ¶ 5. Therefore, Revlon asserts that it has an equitable lien and/or administration claim in the Schedule 4 as well as the Schedule 3 equipment.

However, there is no such cross-default clause in Schedule 3. Hence, a maintenance default under Schedule 4 is not a maintenance default under Schedule 3.

Furthermore, because Schedule 4 is an unexpired lease, any claims with respect to rights and obligations under Schedule 4 are premature and irrelevant to the determination of the parties' rights and obligations in connection with the Schedule 3 equipment. Only claims with respect to the Schedule 3 equipment are before this Court as the Trustee has only sought to recover the Schedule 3 equipment. Moreover, Revlon has not applied to this Court for an order requiring the Trustee to either assume or reject Schedule 4.

Accordingly, it is clear that any claims by Revlon to an equitable lien in the Schedule 4 equip-

ment must fail for the same reasons that such claims fail in respect to Schedule 3.

13. Revlon cannot rely on overriding equity principles in its attempt to convince this Court that an equitable lien was created.

First, the relief Revlon seeks, the free lifetime use of a machine which both parties agree has a substantial value today, is manifestly inequitable. The relief sought is also contrary to the basic bankruptcy law policy of equality of distribution. *See, e.g., Nathanson v. NLRB* 344 U.S. 25, 29, 73 S.Ct. 80, 97 L.Ed. 23 (1952). Second, Revlon cannot prevail upon this Court's sense of equity by its mere assertion that it benefitted the estate by its payments of monthly maintenance charges. As discussed more fully *infra* at pp. 121–122, Revlon has submitted no evidence of how its payments of monthly maintenance charges conferred actual value on the estate as a whole. This is especially so in light of the fact that its payments of maintenance charges were made pursuant to its duty to protect the equipment under Master Lease Sections 7.1 and 8.

theless be subordinate to the subsequent legal lien of a judgment creditor. Thus, such lien is invalid against the Trustee who has the status of a hypothetical lien creditor. 11 U.S.C. § 544(a) (Supp. IV 1980). The legislative history of the Bankruptcy Code makes clear that Article 9 of the U.C.C. treats equitable liens as "unperfected security interests which the trustee can in any case set aside." H.R.Rep.No.595, 95th Cong., 1st Sess. 209 (1977), U.S.Code Cong. & Admin.News 1978, p. ——. The U.C.C. also specifically states this principle. See N.Y.U.C.C. § 9–301(3) (McKinney Supp.1982). Accord, In re Ultimate Corp., 168 F.2d 917 (2d Cir.), cert. denied, 335 U.S. 885, 69 S.Ct. 238, 93 L.Ed. 424 (1948); In re Washington Communications Group, Inc., 10 B.R. 676, 679 (Bkrtcy.D.D.C.1981).

In In re Ultimate Corp., there was a dispute between a bankrupt contractor's surety and trustee over a check paid to a receiver of the bankrupt before a petition was filed. The referee held that the surety was entitled to this money as the surety had obtained a valid equitable lien on the guarantee funds. The Second Circuit reversed, holding that the equitable lien was subordinate to the subsequent legal lien of the bankruptcy trustee as a hypothetical lien creditor under the predecessor to Section 544 of the Code.

In sum, this Court finds that no equitable lien is created by the Dollar Option.[14] Revlon has not demonstrated that the parties intended a lien on the property and thus has not fulfilled the requirement of "strict proof" embodied in the case law. Similarly, Revlon has not shown in any way that the purportedly secured party has employed all available means to create a legal lien. In any event, an equitable lien is subordinate to that of a trustee under Code Section 544(a). Accordingly, Revlon must return the Schedule 3 equipment to the Trustee.[15]

## V. Revlon's Purported Administrative Claim

Revlon claims that as a matter of law it is entitled to a priority administrative claim pursuant to 11 U.S.C. § 503(b)(1)(A) for all of its damages flowing from the post-petition maintenance default of O. P. M. Revlon alleges that this amount is in excess of $140,000 and was incurred due to Revlon's direct payments to IBM for maintenance. Revlon does not specify, however, how this figure is arrived at or whether it includes Revlon's right to reimbursement because the estimated monthly charges were greater than the actual maintenance charges. Revlon also fails to allege which part of this $140,000 is attributable to Schedule 4 equipment maintenance.

14. Revlon further argues that this Court should grant it the same protection afforded a good faith transferee from whom the trustee recovers property under 11 U.S.C. § 550(d) (Supp. IV 1980). Under this section, the transferee has a lien on the property to secure the cost of any improvement made by the transferee.

This section, however, is a specific statutory exception limited only to actual "good faith transferees" which should not be used by analogy here. In addition, by its terms, this Section merely secures the lesser of: (1) the cost of the improvement less any profit realized from the property; and (2) any increase in value of the property as a result of such improvement. Under this standard, Revlon should receive nothing since the benefits accrued to Revlon from its use of the equipment must have been greater than its payments of monthly maintenance charges. Otherwise, Revlon's retention of the equipment would have made no economic sense. Furthermore, there was no increase in the value of the equipment. Revlon's payments to the maintenance supplier merely pre-

served the equipment in preventing it from deteriorating through use. Revlon is, therefore, not entitled to any protection pursuant to this section.

15. Revlon asserts that it is entitled to assign the Schedule 3 equipment until the expiration of the Dollar Option. However, as discussed supra, the Dollar Option is void as a penalty, was properly rejected by the Trustee, and does not constitute a valid legal or equitable security interest. Therefore, Revlon has no interest in the Schedule 3 equipment beyond the date of the Schedule 3 expiration, January 31, 1982, and cannot now assign the equipment.

Even if the lease did not expire on January 31, 1982, the equipment could not have been assigned to any third party without O. P. M.'s written approval. See Master Lease Section 5.2 and discussion supra at p. 109. Such approval by O. P. M. has never been sought by Revlon.

For the reasons hereinafter detailed, this Court denies Revlon summary judgment as to this administrative claim because it is premature in that many factual issues must be resolved before entitlement can be determined. However, the Trustee's motion for summary judgment denying Revlon this administrative claim is granted insofar as it refers to expenses incurred after January 31, 1982 on the Schedule 3 equipment.

■ Section 503(b)(1)(A) defines administrative expenses as the actual and necessary costs and expenses of preserving the estate. It is well-established that those expenses incurred to preserve the estate for the benefit of *all* creditors are compensable as administrative expenses. *See, e.g., In re Meyers, Inc.,* 15 B.R. 390, 392 (Bkrtcy.S.D. Cal.1981) (emphasis added); *In re Lee,* 3 B.R. 15, 17 (Bkrtcy.N.D.Ga.1979). Where a creditor incurs expenses primarily in its own interest, this creditor is not entitled to a priority administrative claim. *See, e.g., In re MCK, Ltd.,* 14 B.R. 518, 520 (Bkrtcy.D. Col.1981).

■ In addition, the wording of Section 503(b)(1)(A) defining administrative expenses as those that are "actual" and "necessary" limits the scope of these expenses. These modifiers must be narrowly construed, *see* 3 *Collier on Bankruptcy* ¶ 503.04 at 503–16 (15th Ed. 1982), in order to keep fees and administrative expenses at a minimum so as to preserve the estate for the benefit of all its creditors. *See Otte v. U. S.,* 419 U.S. 43, 53, 95 S.Ct. 247, 254, 42 L.Ed.2d 212 (1974). Therefore, courts analyze the impact of these expenses to insure that the expenses did in fact confer actual value on the estate as a whole. *See, e.g., In re Rhymes, Inc.,* 14 B.R. 807, 808 (Bkrtcy.D. Conn.1981); *In re McK,* 14 B.R. at 520.

■ A claim arising under an executory contract is entitled to priority "if the trustee . . . elects to assume the contract or if he receives benefits under it." *In re Unishops, Inc.,* 553 F.2d 305, 308 (2d Cir. 1977); *American Anthracite and Bituminous Coal Corp. v. Leonardo Arrivabene, S. A.,* 280 F.2d 119, 124 (2d Cir. 1960); *In re W. T. Grant Co.,* 474 F.Supp. 788, 793 (S.D.N.Y.), *aff'd,* 620 F.2d 319 (2d Cir. 1979), *cert. denied sub nom. Rodman v. Kinier,* 446 U.S. 983, 100 U.S. 2963, 64 L.Ed.2d 839 (1980); *In re Barney Schogel, Inc.,* 12 B.R. 697, 720–21 (Bkrtcy.S.D.N.Y.1981). In addition, a creditor is not entitled to an administrative claim where it has discharged its own debt, regardless of any incidental benefit to the debtor. *See, e.g., R. J. Saunders & Co., v. Vincent,* 309 F.2d 65, 67 (2d Cir. 1962); *In re McK, Ltd.,* 14 B.R. at 520.

Under these legal standards and the instant facts, this Court cannot hold as a matter of law that Revlon is entitled to an administrative claim for maintenance payments on the Schedule 3 and 4 equipment because many factual issues remain to be resolved by the trier of fact.[16] For example, Revlon has not specified how its postpetition payments to IBM enhanced the residual value of the Schedule 3 and 4 equipment and thus benefitted all of the creditors of the estate. *See, e.g., In re Meyers, supra.* In addition, Revlon has not specified any alternate manner by which these expenses conferred actual value on the estate as a whole. *See, e.g., In re Rhymes, supra.*

Revlon has submitted insufficient evidence that its maintenance payments were not primarily in discharge of its own lease obligation to maintain the equipment to warrant judgment as a matter of law that these payments were intended to benefit

---

16. However, with regard to maintenance payments on the Schedule 3 equipment incurred after this Schedule's expiration on January 31, 1982, we grant the Trustee's motion for summary judgment denying Revlon an administrative claim for these payments. These expenses were incurred solely for Revlon's own benefit to enable its continued use of the equipment. Indeed, had Revlon returned the equipment to the Trustee at the end of the lease term, Revlon would have incurred no expense for maintenance. This is because the payment of maintenance charges is necessary not to preserve the equipment, but rather to keep it in use. Revlon did not possess the right to keep this equipment in use after January 31, 1982. Accordingly, Revlon has no right to an administrative claim on the Schedule 3 equipment after Schedule 3 expired.

the estate as a whole. *See, e.g., R. J. Sauders & Co., supra.* Moreover, Revlon has not demonstrated how its rental payments, including maintenance charges, benefitted all the creditors of the estate and were not simply in discharge of its unconditional obligation to make rental payments under the hell and high water clause contained in the lease.

Based upon the foregoing, it is my determination that (1) the Trustee's motion for summary judgment denying Revlon an administrative claim is granted insofar as it refers to Schedule 3 expenses incurred after the expiration of Schedule 3, January 31, 1982; and (2) Revlon may not be granted judgment as a matter of law on its claim for over $140,000 in administrative expenses. It should be noted, however, that this holding is without prejudice to Revlon's right to file an administrative claim for its post-petition maintenance expenses on the Schedule 4 equipment from the filing date to the present and on the Schedule 3 equipment from the filing date until January 31, 1982. Revlon's right to file administrative claims is, of course, subject to the Trustee's right to challenge these claims.

## VI. *Liability for the Rental Value of the Equipment*

An analysis of the applicable law leads this Court to conclude, as the Trustee contends, that Revlon is liable in *quantum meruit* to pay the fair rental value for its use of the Schedule 3 equipment from the date of expiration of Schedule 3 of January 31, 1982 until its turnover to the Trustee.

In a similar case, *In re Olin of New York, Inc.,* 3 B.C.D. 405 (Bankr.S.D.N.Y.1977), plaintiff leased vehicles from the debtor prepetition under Chapter XI pursuant to an agreement which included a purchase option. Defendant refused to transfer title and plaintiff retained possession of the vehicles without paying rentals. Because the trustee had failed to assume the contract with the plaintiff, the court held that it was terminated and ordered the return of the equipment to the trustee. Also, the court held that the plaintiff was liable in *quantum meruit* for the fair rental value of the use of the vehicles because "[t]here is no reason for plaintiff to be enriched at the expense of the defendant's creditors." *Id.* at 407. The court continued, "Since [plaintiff] had the use of the vehicles it is liable in *quantum meruit* to pay for the value of that use. This Court, therefore, in pursuance of its Congressional mandate to exercise equity jurisdiction directs [plaintiff] to return all fourteen vehicles to Olin's trustee at whatever cost, and to pay to Olins the fair rental value of the vehicles." *Id.*

 Similarly, there is no reason to enrich Revlon by allowing it rent-free use of the equipment at the expense of O. P. M.'s creditors. Therefore, pursuant to this Court's exercise of its powers of equity, Revlon is directed to return the equipment to the Trustee and pay the Trustee for the reasonable value of its use.

## VII. *Conclusion*

 Based upon the foregoing conclusions of law, summary judgment is granted as to Revlon's liability on the Trustee's claim and denied as to the Trustee's liability to Revlon on Revlon's counterclaim. This Court may so decide these questions of liability as a matter of law as both sides have agreed at oral argument on these motions and in their Local Rule 3(g) statements [17]

---

**17.** Local Rule 3(g) provides:

(g) Upon motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement of the material facts as to which the moving party contends there is no issue to be tried. Failure to submit such a statement constitutes grounds for denial of the motion.

The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried.

All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to the served by the opposing party.

that there are no triable issues of fact precluding a determination as a matter of law. *See* Fed.R.Civ.P. 56.[18]

Accordingly, it is hereby declared that Revlon is not entitled to continued possession of the Schedule 3 equipment for 59 months at $1.00 per month commencing on February 1, 1982 and must turn over the Schedule 3 equipment forthwith to the Trustee. In addition, Revlon must pay the Trustee a reasonable rental value for the Schedule 3 equipment from February 1, 1982, until the date of its turnover. Such amount is to be determined at a separate hearing on this issue.

Moreover, Revlon has no legal or equitable lien in any amount on the Schedule 3 equipment and may not assign it. In addition, as a matter of law, Revlon does not have an administrative claim as to expenses incurred to maintain that equipment after January 31, 1982. Furthermore, the Court cannot find as a matter of law that Revlon has or does not have an administrative claim on the Schedule 3 equipment from the filing date until January 31, 1982 and on the Schedule 4 equipment from the filing date until the present. However, nothing in this opinion prejudices Revlon's right to file an administrative claim for these post-petition expenses.

Submit an order in conformity with this opinion.

Local Rule 3(g), Rules for the Southern District of New York (1980).

**18.** Revlon's attempt to have this Court consider supplemental affidavits raising new "facts" filed after decision on these motions was reserved must fail. These Rule 56 motions were fully briefed, argued, and marked "submitted" as ripe for determination by the Court on May 27, 1982. None of the parties requested leave of the Court to submit post-submission papers or memoranda.

Notwithstanding the consensual yield to this Court's determination of a mature motion, Revlon filed two supplemental affidavits of Edward W. Karn, a Vice-President of Revlon, on June 9, 1982 and July 9, 1982 purporting to raise new facts. In addition, Revlon submitted an additional affidavit by its counsel, Helen Davis Chaitman, on June 21, 1982. The Karn affidavits were submitted with the apparent intention of raising belated issues of fact concerning the parties' intent to create a security interest and the reasonableness of the Dollar Option.

These two affidavits and the Chaitman Affidavit in support of the admissibility of the June 9, 1982 Karn Affidavit were without application to or leave of the Court and are in violation of Rule 3(c)(3) of the Civil Rules of the District of New York. Accordingly, these affidavits are outside the scope of this Court's consideration. This Court notes parenthetically that the Karn Affidavit of June 9, 1982 directed at raising facts concerning the parties' intention to create a security interest relates to equipment schedules wholly irrelevant to the instant proceedings. In addition, the Second Supplemental Karn Affidavit filed July 29, 1982 directs the court to a consideration in hindsight of whether the Dollar Option was in fact a penalty to O. P. M. Such a hindsight inquiry is totally irrelevant to a proper determination of this issue. *See, e.g., United Merchants and Manufacturers, supra.*